# UNITED STATES *v.* IRON SILVER MINING COMPANY.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

No. 82. Argued and submitted November 15, 1888.— Decided December 17, 1888.

Misrepresentations, knowingly made by an applicant for a mineral patent, as to discovery of mineral, or as to the form in which the mineral appears, whether in placers, or in veins, lodes or ledges, will justify the government in moving to set aside the patent.

In such cases the burden of proof is upon the government, and the presumption that the patent was correctly issued can be overcome only by clear and convincing proof of the fraud alleged. The doctrine of the *Maxwell Land Grant Case*, 121 U. S. 325, and of *Colorado Coal and Iron Company* v. *United States*, 123 U. S. 307, on this point affirmed.

Exceptions made by the statute cannot be enlarged by the language of a patent. The statute only excepts from placer patents, veins or lodes known to exist at the date of application for patent.

To establish the statutory exception from a placer patent the lodes or veins must be clearly ascertained, and be of such extent as to render the land more valuable on that account and justify their exploitation.

The certificate of the surveyor general is made by statute evidence·of the sufficiency of work performed and improvements made on a mining claim. In the absence of fraudulent representations respecting them to him by the patentee, his determination as to their sufficiency, unless corrected by the Land Department, before patent, must be taken as conclusive. His estimate is open to examination by the Department before patent, and any alleged error in it cannot afterwards be made ground for impeaching the validity of the patent.

IN EQUITY. The bill charged that two patents for placer mining claims had been obtained upon false and fraudulent representations and prayed for their cancellation. The answer denied all the allegations of fraud. The bill was dismissed, from which decree the United States took this appeal.

*Mr. Solicitor General* for appellants.

*Mr. L. S. Dixon,* for appellees, submitted on his brief.

MR. JUSTICE FIELD delivered the opinion of the court.

This is a suit in equity brought by the United States against the Iron Silver Mining Company, a corporation created under the laws of New York, and James A. Sawyer, a citizen of Colorado, to cancel two patents for alleged placer mining claims, known respectively as the Fanchon placer claim and the Stinson placer claim, situated in the county of Lake, Colorado. Both patents were issued to the defendant Sawyer, and the larger part of the claims was subsequently conveyed by him to the defendant corporation.

The Fanchon claim embraces 113 acres and a fraction of an acre. The patent for it bears date November 17, 1881, and was issued upon an entry made April 22, 1880.

The Stinson claim embraces 124 acres and a fraction of an acre. The patent for it bears date June 15, 1881, and was issued upon an entry made April 27, 1880.

The bill for the cancellation of these patents alleges that they were obtained upon false and fraudulent representations

.hat the land embraced by them was placer mining ground, and contained no veins or lodes of quartz or other rock bearing gold or silver or other metal, and that the patentee had performed the work upon each tract required by law to entitle him to enter it as a placer claim; whereas, in fact, the land was not placer mining ground, but land containing sundry veins or lodes of quartz or other rock bearing gold, silver and lead of great value, which was well known to the patentee on his application for the patents; and that the work required to enter the tracts as placer claims had never been performed.

The bill also alleges that the defendant Sawyer had previously made several locations of lode claims on this ground, and that certificates of these locations had been recorded in the office of the recorder of Lake County; that he afterwards entered into a conspiracy with one William H. Stevens and Levi Z. Leiter, of Colorado, to defraud the United States of the lode claims and the timber on the land, of which there was a valuable growth, by obtaining patents of the land as placer ground, for the benefit of those parties and of the defendant, the Iron Silver Mining Company, in which they were interested; that by its terms the defendant Sawyer was to abandon the lode claims and take up the ground as placer claims, and Stevens and Leiter were to advance the necessary funds for that purpose; that when the patents were obtained Sawyer was to receive in consideration of his services in the matter a portion of the claims; and that the patents in question were obtained in execution of this conspiracy.

These allegations are specifically denied by the defendants in their answer, and the proofs in the case were directed to establish them on the one hand, and to refute them on the other. If established, the government could justly demand a cancellation of the patents. The statutes providing for the disposition of the mineral lands of the United States are framed in a most liberal spirit, and those lands are open to the acquisition of every citizen upon conditions which can be readily complied with. It is the policy of the government to favor the development of mines of gold and silver and other metals, and every facility is afforded for that purpose; but it

exacts a faithful compliance with the conditions required. There must be a discovery of the mineral, and a sufficient exploration of the ground to show this fact beyond question. The form also in which the mineral appears, whether in placers or in veins, lodes or ledges, must be disclosed so far as ascertained. Misrepresentation knowingly made as to these matters by the applicant for a patent will afterwards justify the government in proceeding to set it aside. The government has the same right to demand a cancellation of the conveyances of the United States when obtained by false and fraudulent representations as a private individual when a conveyance of his lands is obtained in like manner. In this respect the United States, as a landed proprietor, stand upon the same footing with the private citizen. The burden of proof in such cases is upon the government. The presumption attending the patent, even when directly assailed, that it was issued upon sufficient evidence that the law had been complied with by the officers of the government charged with the alienation of public lands, can only be overcome by clear and convincing proof. In several cases recently before this court the character and degree of proof required to set aside a patent for land of the United States issued in due form by their officers, where they have had jurisdiction over the subject and have observed the various proceedings preliminary to its issue required by law, have been discussed and determined, and rules laid down which must control in future cases of the kind.

In *Maxwell Land Grant Case,* which was before us at October term, 1886, this question received careful consideration. 121 U. S. 325, 379, 381. The court there said, by Mr. Justice Miller: "The deliberate action of the tribunals, to which the law commits the determination of all preliminary questions and the control of the processes by which this evidence of title is issued to the grantee, demands that, to annul such an instrument and destroy the title claimed under it, the facts on which this action is asked for must be clearly established by evidence entirely satisfactory to the court, and that the case itself must be within the class of causes for which such an instrument may be avoided." And again: "We take the

general doctrine to be, that when in a court of equity it is proposed to set aside, to annul or to correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal and convincing, and that it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt. If the proposition, as thus laid down in the cases cited, is sound in regard to the ordinary contracts of private individuals, how much more should it be observed where the attempt is to annul the grants, the patents, and other solemn evidences of title emanating from the government of the United States under its official seal. In this class of cases, the respect due to a patent, the presumptions that all the preceding steps required by the law had been observed before its issue, the immense importance and necessity of the stability of titles dependent upon these official instruments, demand that the effort to set them aside, to annul them, or to correct mistakes in them, should only be successful when the allegations on which this is attempted are clearly stated and fully sustained by proof."

In *Colorado Coal Company* v. *United States*, 123 U. S. 307, before us at October term, 1887, the same subject was considered, and a similar conclusion reached, as to the character and degree of proof necessary to invalidate a patent of the United States. There patents for coal lands were alleged to have been obtained on false and fraudulent papers made by the register and receiver of the local land office combining with others in a conspiracy for that purpose; but the court, after referring to the doctrine declared in *Maxwell Land Grant Case*, said, by Mr. Justice Matthews: "It thus appears that the title of the defendants rests upon the strongest presumptions of fact which, although they may be rebutted, nevertheless can be overthrown only by full proofs to the contrary, clear, convincing and unambiguous. The burden of producing these proofs and establishing the conclusion to which they are directed rests upon the government. Neither is it relieved of this obligation by the negative nature of the proposition it is bound to establish." Authorities are then cited to show that

in some instances the burden of proving a negative rests upon the complaining party; and especially so where the negative allegation involves a charge of fraud against the party whose conduct is complained of, for which it is sought to defeat an estate.

In this connection a word should be said of a paragraph in the opinion in *Moffat* v. *United States*, 112 U. S. 24, 30. That was a suit to set aside a patent issued to fictitious parties; and the court, referring to the presumption which is indulged as a protection against collateral attacks upon a patent by third parties, said: "It may be admitted, as stated by counsel, that if, upon any state of facts, the patent might have been lawfully issued, the court will presume, as against such collateral attacks that the facts existed; but that presumption has no place in a suit by the United States directly assailing the patent and seeking its cancellation for fraud in the conduct of their officers." It was not intended by this language to hold that presumptions in favor of the regularity and lawfulness of patents issued did not apply in suits by the United States to vacate them for fraud; but that the presumption mentioned — that is, that when a patent is assailed collaterally, if it could be sustained upon any state of facts, the court will presume that such facts existed — could not apply in suits by the United States assailing the patent for fraud in the conduct of their officers. This is evident from what immediately follows in the opinion, for the court adds: "In such a suit the burden of proof is undoubtedly, in the first instance, on the government to show a fatal irregularity or corrupt conduct on their part; but when a case is established, which, if unexplained, would warrant a conclusion against them, the burden of proof is shifted, and they must show such integrity of conduct, and such a compliance with the law, as will sustain the patent." If the presumption mentioned could be admitted, no suit of the kind could be sustained, for facts could be stated which would overthrow the allegations of fraud.

The patents in controversy were issued under §§ 2329 and 2333 of the Revised Statutes, which are as follows:

"Sec. 2329. Claims, usually called 'placers,' including all

forms of deposit, excepting veins of quartz, or other rock in place, shall be subject to entry and patent, under like circumstances and conditions, and upon similar proceedings, as are provided for vein or lode claims; but where the lands have been previously surveyed by the United States, the entry in its exterior limits shall conform to the legal subdivisions of the public lands."

"SEC. 2333. Where the same person, association, or corporation is in possession of a placer claim, and also a vein or lode included within the boundaries thereof, application shall be made for a patent for the placer claim, with the statement that it includes such vein or lode, and in such case a patent shall issue for the placer claim, subject to the provisions of this chapter, including such vein or lode, upon the payment of five dollars per acre for such vein or lode claim, and twenty-five feet of surface on each side thereof. The remainder of the placer claim, or any placer claim not embracing any vein or lode claim, shall be paid for at the rate of two dollars and fifty cents per acre, together with all costs of proceedings; and where a vein or lode, such as is described in section twenty-three hundred and twenty is known to exist within the boundaries of a placer claim, an application for a patent for such placer claim which does not include an application for the vein or lode claim shall be construed as a conclusive declaration that the claimant of the placer claim has no right of possession of the vein or lode claim; but where the existence of a vein or lode in a placer claim is not known, a patent for the placer claim shall convey all valuable mineral and other deposits within the boundaries thereof."

By the term "placer claim," as here used, is meant ground within defined boundaries which contains mineral in its earth, sand or gravel; ground that includes valuable deposits not in place, that is, not fixed in rock, but which are in a loose state, and may in most cases be collected by washing or amalgamation without milling.

By "veins or lodes," as here used, are meant lines or aggregations of metal embedded in quartz or other rock in place. The terms are found together in the statutes, and both are

intended to indicate the presence of metal in rock. Yet a lode may and often does contain more than one vein. In *Iron Silver Mining Co.* v. *Cheesman*, 116 U. S. 529, 533, a definition of a lode is given, so far as it is practicable to define it with accuracy, and it is not necessary to repeat it. What is important here is, that the amount of land which may be taken up as a placer claim and the amount as a lode claim, and the price per acre to be paid to the government in the two cases, when patents are obtained, are different. And the rights conferred by the respective patents, and the conditions upon which they are held, are also different. Rev. Stat. §§ 2320, 2322, 2325, 2333; *Smelting Co.* v. *Kemp*, 104 U. S. 636, 651; *Iron Silver Mining Co.* v. *Reynolds*, 124 U. S. 374.

The patent for the Stinson claim contained the following conditions:

*First.* That the grant is restricted in its exterior limits to the boundaries of the tract described, and to any veins or lodes of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper, or other valuable deposits, which may hereafter be discovered within said limits, and which are not claimed or known to exist at the date thereof.

*Second.* That should any vein or lode of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper, or other valuable deposits, be claimed or known to exist within the described premises, at the date thereof, the same is expressly excepted and excluded therefrom.

The patent for the Fanchon placer claim contains similar conditions.

The exception from grant in each patent of any vein or lode of quartz or other rock in place bearing gold, copper, silver, cinnabar, lead, tin, or other valuable deposit, "claimed or known to exist" at the date of the patent within the described premises, is in terms broader than the language of the statute under which the patents were issued. The exception of the statute cannot be thus enlarged. The statute does not except veins or lodes "claimed or known to exist," but only such as are known to exist at the time the application is made for the patent, and not at the date of the patent. When

such a vein or lode is known to exist within the boundaries of the placer claim, the application for a patent, which does not include also an application for the vein or lode, is to be construed as a conclusive declaration that the claimant has no right of possession to it; but where the existence of a vein or lode in a placer claim is not known at the time of the application for a patent, that instrument will convey all valuable mineral and other deposits subsequently found within the boundaries of the claim.

In the present case the evidence produced establishes substantially these facts: That in 1879 the defendant Sawyer prospected the ground which constitutes the claims, in search of mines of gold and silver; that in this work he was assisted by three or four men whom he employed; that he made several excavations of ten feet in depth to find lodes which, he was told, existed within the premises; and that he made several lode locations, and filed and recorded certificates thereof. Subsequently, in October of that year, he found himself embarrassed by debts owing to his men, and for supplies; and he applied to Mr. Stevens, mentioned above, to purchase an interest in a claim which he held. It does not appear that any purchase was made of that interest, but Stevens agreed to look at the lode claims on the ground subsequently entered as placer claims. Accordingly, the two, Stevens and Sawyer, went over the ground together, and examined the excavations made, and also the timber on the land. After such examination, Stevens stated to Sawyer that it was a waste of money to excavate for lode claims on that ground; that its formation was not such as contained lodes; that the rock was not granite, but gneiss; and advised him to take it up as placer ground, provided a way could be traced to bring water for its working from a neighboring stream called Lake Creek, adding that the course he thus recommended would accomplish two purposes — it would save the timber, and enable him to successfully work the placer. Afterwards, and in pursuance of this advice, Sawyer concluded to abandon the lode locations he had made and to file an application for patents for placer claims, Stevens and Mr. Leiter, who appears

to have been a friend both of Stevens and Sawyer, agreeing to advance the money required to make the necessary explorations and improvements and the application for the patents, and Sawyer agreeing to do the necessary work, and when the patents were obtained to convey the claims to them, reserving a share for himself. Stevens was examined as a witness in the case, and in his testimony stated that he had known the ground since June 1, 1879; that it had a rolling and uneven surface, with gulches, ravines, and small streams running through it, and was covered with a young and thrifty growth of timber; that he had crossed and recrossed it several times, and carefully examined all the shafts, pit-holes and excavations, with reference to their mineral value, and had come to the conclusion that it contained no lodes, veins, or ledges of rock in place bearing gold, silver, lead, or other minerals of value; that the only mineral found was float-gold in deposits of sand and gravel, and in his opinion it was placer mining ground; and that he had made an examination with pocket instruments and found that the waters of Lake Creek could be easily brought in ditches and flumes to work the placers. He then testified as follows: "After deciding it was placer ground, and practicable to bring water on it, Mr. Leiter and myself accepted a proposition from Mr. Sawyer to furnish the money in order to make the necessary explorations, improvements, and entry of application for government patent; he, Sawyer, to do all the work and obtain title, for a share in the property. Our object and purpose in assisting Sawyer was to obtain an interest in said placer land, being convinced of its character as such."

The deputy United States surveyor, who made two surveys of the ground included within the placer claims, one for the parties interested in locating the claims, and the other the official survey, on which the application for the patents was based, by direction of the surveyor general, was also examined as a witness, and he testified that in September or October, 1879, he made an examination of the ground for the purpose of determining whether any veins, lodes, or ledges of mineral in rock in place, or gold bearing rock, had been discovered

upon it, and for that purpose had explored every pit, cut and
shaft on the property, and found that there had not been dis-
covered in them any mineral-bearing rock in place; and that,
at the time he made both surveys, and at the time the applica-
tions for the patents were made, there was not known to exist
within the placer claims any lode or ledge of rock bearing
gold, silver, or other valuable deposit. He further testified
that he had resided for several years in Colorado, and was
familiar with placer, lode, and vein formations.

In pursuance of the arrangement with Stevens and Leiter,
Sawyer performed the labor and made the improvements
necessary to obtain the placer patents, and applied for the
land as placer ground, (other parties who had joined with him
in making the locations having transferred their interests to
him,) stating that there were no known lodes or veins upon
the tracts; and such proceedings were then taken as are re-
quired by the Revised Statutes in such cases, and the only
adverse claim made to the applications having been withdrawn,
the patents were issued.

It appears very clearly from the evidence that no lodes or
veins were discovered by the excavations of Sawyer in his
prospecting work, and that his lode locations were made upon
an erroneous opinion, and not upon knowledge, that lodes
bearing metal were disclosed by them. It is not enough that
there may have been some indications by outcroppings on the
surface, of the existence of lodes or veins of rock in place
bearing gold or silver or other metal, to justify their designa-
tion as "known" veins or lodes. To meet that designation
the lodes or veins must be clearly ascertained, and be of such
extent as to render the land more valuable on that account,
and justify their exploitation. Although pits and shafts had
been sunk in various places, and what are termed in mining
cross-cuts had been run, only loose gold and small nuggets had
been found, mingled with earth, sand and gravel. Lodes and
veins in quartz or other rock in place bearing gold or silver or
other metal were not disclosed when the application for the
patents was made. The subsequent discovery of lodes upon
the ground, and their successful working, does not affect the

good faith of the application. That must be determined by what was known to exist at the time. It is not, therefore, a fault to be charged upon Sawyer that he abandoned his original lode locations after he had discovered that they were worthless, in order to make locations of placer claims. There was evidence that loose gold existed in the sand and gravel on the ground in many places, and had been washed from the earth; and it was the judgment of experienced miners that if water could be brought from a neighboring creek the ground could be successfully worked as placer ground.

It may be, as contended, that Stevens was moved in his advice to Sawyer as much by the existence of the valuable growth of timber on the land as by the existence of gold in the ground, and that the timber could be advantageously used by the Iron Silver Mining Company. If such were the fact, it would not affect the applicant's claim to a patent. Probably in a majority of cases where a placer claim is located, other matters than the existence of valuable deposits of mineral enter into the estimate of its worth. Its accessibility to places where supplies and medical attendance can be obtained for the men engaged in working upon it, and timber secured to support the drifting or tunnelling which may be necessary; the facility with which water can be brought to wash the mineral from the earth, sand, or gravel with which it may be mingled; and the uses to which the land may be subjected when the claim is exhausted, may be proper subjects of consideration. A prudent miner acting wisely in taking up a claim, whether for a placer mine or for a lode or vein, would not overlook such circumstances, and they may in fact control his action in making the location. If the land contains gold or other valuable deposits in loose earth, sand or gravel which can be secured with profit, that fact will satisfy the demand of the government as to the character of the land as placer ground, whatever the incidental advantages it may offer to the applicant for a patent. Nor do we consider it a suspicious circumstance, or even surprising, that when Sawyer came to convey to Stevens and Leiter, pursuant to his arrangement with them, a part of the claims, he should have retained those

portions which he had originally taken up as lode claims; for though shown not to be such claims in fact, they constituted ground which he had examined, and believed to be valuable for gold, having in some instances exhibited traces of it. The question respecting the whole proceedings taken upon that arrangement is one of good faith towards the government in securing thereby its patents, and that we deem to be fully established.

We have gone over with great care all the testimony adduced by the government in the case; and our conclusion is that it wholly fails to substantiate the charges of false and fraudulent representations to obtain the patents, or of a conspiracy by the patentee and others to defraud the government. We perceive nothing in what was said or done by him, or by those who advised and assisted him, which justifies the imputations of the government upon his or their conduct.

The sufficiency of the work performed and improvements made upon each of the claims patented was shown by the certificate of the surveyor general of the United States for the State in which the claims are situated. The statute makes his certificate evidence of that fact. Rev. Stat. § 2325. It declares, where publication is made of the application for a patent, that "the claimant at the time of filing this application, or at any time thereafter, within the sixty days of publication, shall file with the register a certificate of the United States surveyor general that five hundred dollars' worth of labor has been expended or improvements made upon the claim by himself or grantors." He was fully informed of the character and value of the labor performed and improvements made through his deputy, who had personally examined them and estimated their cost, and also secured affidavits of others on that subject. Their sufficiency, both as to amount and character, were matters to be determined by him from his own observation, or from the testimony of parties having knowledge of the subject; and in such cases, where there are no fraudulent representations to him respecting them by the patentee, his determination, unless corrected by the Land Department before patent, must be taken as conclusive. His

estimate here in both particulars was subject to be examined by the Department before the patents were issued; and any alleged error in it cannot afterwards be made ground for impeaching their validity.

*Decree affirmed.*