CONNOR et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. May 4, 1914.)

No. 2240.

1. EQUITY (§ 409*)—REFERENCE BY CONSENT—FINDINGS OF MASTER.
   When, pursuant to a stipulation of the parties, all of the issues in a suit in equity are referred to a master, to take the proofs and report the same, together with his findings, his findings of fact are not subject to be set aside and disregarded at the mere discretion of the court; but so far as a finding depends on conflicting testimony or on the credibility of witnesses, or so far as there is any competent testimony consistent with a finding, it must be treated as unassailable. Nor may the court disregard such findings, and proceed to make findings of its own, because the master failed to make findings on all the issues, or for other insufficiency in his report; but in such case the cause should be resubmitted, with proper instructions.
   [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 904, 920–923; Dec. Dig. § 409.*]

2. PUBLIC LANDS (§ 120*)—SUIT FOR CANCELLATION OF PATENT FOR FRAUD—MEASURE OF PROOF REQUIRED.
   To authorize a court to set aside and cancel a patent to lands issued by the United States on the ground of fraud, the evidence must be clear,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

unequivocal, and convincing, and it cannot be done on a bare preponderance of evidence, which leaves the issue of fraud in doubt. Especially should such rule be observed where the patent sought to be canceled is one for a desert entry, and, under Act March 3, 1877, c. 107, 19 Stat. 377, to which section 7 was added by Act March 3, 1891, c. 561, § 2, 26 Stat. 1096 (U. S. Comp. St. 1901, p. 1550), the result of cancellation would also be a forfeiture of the amount paid for the land.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332–335; Dec. Dig. § 120.*]

3. PUBLIC LANDS (§ 120*)—SUIT FOR CANCELLATION OF PATENTS FOR FRAUD—SUFFICIENCY OF EVIDENCE.

Evidence considered, and *held* insufficient to warrant the cancellation of patents to desert lands on the ground that the testimony on which final proof was made was false and fraudulent with respect to the reclamation of the land and the quantity of water owned or appropriated by the entrymen for irrigation purposes.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332–335; Dec. Dig. § 120.*]

4. PUBLIC LANDS (§ 37*)—DESERT LAND ACT—CONSTRUCTION—AMOUNT OF IRRIGATION REQUIRED.

Desert Land Act March 3, 1877, c. 107, 19 Stat. 377, as amended by Act March 3, 1891, c. 561, § 2, 26 Stat. 1096 (U. S. Comp. St. 1901, p. 1548), does not require an entryman to irrigate or conduct water upon such parts of the tract entered as are incapable of profitable cultivation, nor beyond the portion cultivated, which must, however, equal one-eighth of the entire tract.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 81; Dec. Dig. § 37.*]

Appeals from the District Court of the United States for the District of Montana; George M. Bourquin, Judge.

Suits in equity by the United States against William Connor and against Ida Connor (consolidated). Decrees for the United States, and defendants appeal. Reversed.

On the 30th day of June, 1899, the appellant Ida Connor, proceeding under and by virtue of the provisions of the act of Congress of March 3, 1877, entitled "An act to provide for the sale of desert lands in certain states and territories," as amended by the act of Congress approved March 3, 1891, filed in the land office of the United States at Helena, Mont., her declaration of intention to reclaim, by conducting water upon the same, the S. ½ of section 20, township 15 N., range 4 W., of the principal meridian of the state of Montana, containing 320 acres. At the time of the filing of her declaration of intention to reclaim, the appellant paid to the receiver of the land office the sum of $80, being at the rate of 25 cents per acre for the whole of the land filed upon and entered by her. The lands passed to final proof on August 22, 1901, at which time, pursuant to law, the appellant filed with the register of the land office her deposition, together with the depositions of two witnesses, in each of which it was alleged and set forth, among other things, that the entry woman owned and controlled and had a clear right to the use of water sufficient to irrigate the whole of the land entered upon, and for keeping the same permanently irrigated; that the water was obtained from three springs and their branches on and adjoining the lands, and had been acquired by means of appropriation of 100 inches and maintained by actual use; that from the personal knowledge of each of the affiants water had been conducted upon the land so as to produce a crop of hay thereon; that for the purpose of irrigating and reclaiming the land the appellant had constructed four main ditches, each about 2 feet wide and 2 feet deep; that the amount expended in the construction of these ditches and in the reclamation of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

land was over $3 per acre; that each of the affiants many times during the irrigating seasons of 1901 and 1902 had seen water distributed by means of said ditches over all of the said lands in each legal subdivision thereof, and that during the irrigating season of 1900 each of the affiants had seen water distributed by means of ditches over a large part of the lands. On March 2, 1908, the appellant paid to the receiver of the United States land office the final payment for the lands entered upon by her, amounting to the sum of $320, and thereafter, and on June 25, 1908, a patent covering the land was issued to the appellant by the United States of America.

On June 30, 1899, one William Thompson, proceeding under and by virtue of the provisions of the aforementioned act of Congress of March 3, 1877, entitled "An act to provide for the sale of desert lands in certain states and territories," as amended by the act of Congress approved March 3, 1891, filed in the land office of the United States at Helena, Mont., his declaration of intention to reclaim, by conducting water upon the same, the N. W. 1/4 of section 20, township 15 N., range 4 W., of the principal meridian of the state of Montana, containing 160 acres. At the time of the filing of the declaration of intention, the applicant paid to the receiver of the United States land office the sum of $40, being at the rate of 25 cents per acre for the whole of the land so filed upon and entered by him. On July 1, 1901, Thompson, by a certain instrument in writing of that date, transferred and assigned all his right, title, and interest in and to the land so entered upon by him to the appellant herein, William Connor, which assignment was thereafter filed in the United States land office at Helena, Mont., together with an affidavit of the assignee that he was qualified to take the land under the desert land laws of the United States. The land passed to final proof on August 22, 1901, at which time, pursuant to law, the appellant William Connor filed with the register of the land office his deposition, together with the depositions of two witnesses, in each of which it was alleged, among other things, that the appellant owned, controlled, and had a clear right to the use of water sufficient to irrigate the whole of the lands and keep the same permanently irrigated; that the water was obtained from three springs and their branches, and had been acquired by means of appropriation of 100 inches and maintained by actual use; that from the personal knowledge of each of the affiants water had been conducted upon all of the land so as to produce agricultural crops or paying crops of hay thereon; that for the purpose of irrigating and reclaiming the lands the appellant had constructed four main ditches, each about 2 feet wide and 2 feet deep, and that the amount expended in the construction of these ditches and in the reclamation of the lands was over $3 per acre; that each of the affiants, many times during the irrigating seasons of 1900 and 1901, had seen water distributed by means of said ditches over all of the land and each legal subdivision thereof. On March 2, 1908, the appellant paid to the receiver of the United States land office the final payment for the land so entered by him, amounting to the sum of $160, and thereafter, and on June 25, 1908, a patent covering the land was issued to the appellant by the United States of America.

The bills of complaint filed against the appellants by the Attorney General of the United States in August, 1909, are in all substantial respects identical. It is in each alleged that the deposition of each of the appellants, and the deposition of each of their witnesses, made, entered, and filed with the register of the United States land office at the time of the making of final proof on the lands involved in these suits, on August 22, 1901, were false and fraudulent, and were made and filed with intent to deceive the officers of the United States, and fraudulently to obtain title to the lands and by fraud and deceit to procure a United States patent therefor, by means of false and fraudulent statements and testimony contained in the depositions and in each of them, in this: That neither of the appellants owned nor controlled, nor had any clear right, or any right, to the use of water sufficient to irrigate the whole or any part of the lands entered upon by them, respectively, and for keeping the same, or any part thereof, permanently irrigated, at the time of the making of final proof, or at any other time, or at all; that water had not been and never was conducted upon the lands, or any part thereof, from

springs and their branches on and adjoining the land, or any other source of supply, nor had the same, or any part thereof, been irrigated or reclaimed by the appellants; that the appellants had not constructed and did not construct four main ditches, each about 2 feet wide and 2 feet deep, or any other ditch or ditches, of any length, size, or dimension; that the appellants had not expended in the cultivation and reclamation of the land the sum of $3 per acre, or any other amount; that the appellants did not during the irrigating seasons of 1900, 1901, and 1902, or at any other time, or at all, see water distributed through and by means of ditches over all the land in each legal subdivision, or any part thereof. The bills further alleged that the statements so made by the appellants and their witnesses, contained in the depositions and testimony filed at the time of final proof, and which are specifically set forth and contained in the bills, were utterly false, fraudulent, and untrue, as the appellants then and there well knew.

The appellants, in the separate answers filed by them to the bills of complaint, denied specifically each and all of the material allegations of the bills, and in answer to the allegations of fraud therein contained alleged that the depositions filed at the time of the making of final proof were made by them in good faith, believing that the statements therein contained were true in substance, and that at the time the same were made they did own and control water sufficient to irrigate their lands and to keep the same permanently irrigated, so far as the same was necessary and practicable, and that the statements that from their own personal knowledge water had been conducted upon the lands so as to produce crops thereon were true; that likewise the statement that they had constructed four main ditches, in the manner described in the depositions, as well as the other statements in the depositions contained, were true; and that the appellants had at all times complied with the law in securing title to the desert lands so reclaimed by them. Pursuant to stipulation of the attorneys for the respective parties, an order was entered in each of the cases that all and singular the issues in each case be referred to a master in chancery, to take the proofs therein and report the same, together with his findings, to the court. A further stipulation was entered into providing that the cases be consolidated and tried as one case.

The master, by his report, found that the allegations of the bill of complaint in each of the cases were not sustained by the evidence, and that, as a conclusion, both of the bills should be dismissed for failure of proof, and he so recommended. Exceptions to the report were thereupon filed by the United States attorney, the exceptions being thereafter sustained by the court below; the judge thereof concluding that the entries and patents involved in the suits were procured by deceit and fraud of the appellants, and that the complainant was entitled to the decrees prayed for in the bills. Thereafter decrees were entered in the court below, wherein it was ordered and adjudged that the patents theretofore issued by the United States of America to the appellants be canceled, annulled, and held for naught, and vacated and set aside, and, further, that the appellants had no right, title, or interest whatever in or to the tracts of land involved in the suits, or any part or parcel thereof. From these decrees the appellants appealed to this court.

E. A. Carleton, of Helena, Mont., for appellants.

James W. Freeman, U. S Atty., of Great Falls, Mont., and S. C. Ford, Asst. U. S. Atty., of Helena, Mont.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). [1] 1. A preliminary question arises in these suits with respect to certain assignments of error of the appellants wherein it is alleged that it was error on the part of the trial court to refuse to approve the report of the master in chancery, and to order the bills dismissed as the

master recommended, and, further, that the decrees were erroneous, in that, the causes having been tried before the master under a consent agreement, whereby the master was to try all of the issues and report the same to the court, the District Court had no jurisdiction in the matter, except to examine the testimony and see if there was any evidence to support the master's findings, and the testimony being contradictory, and there being evidence in the record to support the master's findings, the only power or jurisdiction the District Court had was to approve these findings and order the bills dismissed.

The stipulation entered into in each of the causes, between counsel for the respective parties, provided that:

"The issues in said matter are referred to said master, and after the testimony and briefs of the respective parties are filed said master shall make his report in accordance with the rules of practice of said court and district."

Pursuant to the stipulation an order was entered by the clerk in each case, which provided that:

"All and singular the issues in the above-entitled case be and the same are hereby referred to Oliver T. Crane, Esq., standing master in chancery of this court, to take the proofs therein and to report the same, together with his findings, to this court."

It is apparent from this stipulation and order that it was the intention of the parties that the master in chancery should exercise powers greater than those which he would have been authorized to exercise upon an ordinary reference, wherein his duties would have been merely to take the testimony in the case and return the same into court. In the latter case, any information which he might communicate by his findings, upon the evidence presented to him, would have been merely advisory to the court, which it might accept and act upon or disregard in whole or in part, according to its own judgment as to the weight of the evidence. Street on Federal Equity Practice, § 1509. But even in cases in which an ordinary reference is made, the rule is that a report on disputed questions of fact will not be set aside or modified, unless the error is entirely plain, or unless it appears to be palpably wrong by the most persuasive weight of evidence. Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664; Fordyce v. Omaha, etc., Ry. Co. (C. C.) 145 Fed. 544.

In the present case, however, it was ordered that all and singular the issues be referred to the master in chancery to take the proofs therein and to report the same, together with his findings, to the court; and we are of opinion that the reference clearly falls within the rule laid down by Mr. Justice Field in the case of Kimberly v. Arms, 129 U. S. 512, 524, 9 Sup. Ct. 355, 359 (32 L. Ed. 764). In that case the learned justice said:

"When the parties consent to the reference of a case to a master or other officer to hear and decide all the issues therein, and report his findings, both of fact and of law, and such reference is entered as a rule of the court, the master is clothed with very different powers from those which he exercises upon ordinary references, without such consent; and his determinations are not subject to be set aside and disregarded at the mere discretion of the court. A reference by consent of parties of an entire case for the determination of all its issues, though not strictly a submission of the controversy to

arbitration—a proceeding which is governed by special rules—is a submission of the controversy to a tribunal of the parties' own selection, to be governed in its conduct by the ordinary rules applicable to the administration of justice in tribunals established by law. Its findings, like those of an independent tribunal, are to be taken as presumptively correct, subject, indeed, to be reviewed under the reservation contained in the consent and order of the court, when there has been manifest error in the consideration given to the evidence, or in the application of the law, but not otherwise. * * * To disregard the findings and treat the report as a mere presentation of the testimony is to defeat, as we conceive, the purpose of the reference and disregard the express stipulation of the parties."

And the Supreme Court in that case accordingly held that the lower court had failed to give to the findings of the master the weight to which they were entitled, and that they should have been treated as so far correct and binding as not to be disturbed, unless clearly in conflict with the weight of the evidence upon which they were made.

In Davis v. Schwartz, 155 U. S. 636, 15 Sup. Ct. 237, 39 L. Ed. 289, Mr. Justice Brown, delivering the opinion of the Supreme Court of the United States, said:

"As the case was referred by the court to a master to report, not the evidence merely, but the facts of the case, and his conclusions * * * thereon, we think that his finding, so far as it involves questions of fact, is attended by a presumption of correctness similar to that in the case of a finding by a referee, the special verdict of a jury, the findings of a Circuit Court in a case tried by the court under Rev. St. § 649 [U. S. Comp. St. 1901, p. 525], or in an admiralty cause appealed to this court. In neither of these cases is the finding absolutely conclusive, as if there be no testimony tending to support it; but so far as it depends upon conflicting testimony, or upon the credibility of witnesses, or so far as there is any testimony consistent with the finding, it must be treated as unassailable. Wiscart v. Dauchy, 3 Dall. 321 [1 L. Ed. 619]; Bond v. Brown, 12 How. 254 [13 L. Ed. 977]; Graham v. Bayne, 18 How. 60, 62 [15 L. Ed. 265]; Norris v. Jackson, 9 Wall. 125 [19 L. Ed. 608]; Insurance Co. v. Folsom, 237, 249 [21 L. Ed. 827]; The Abbotsford, 98 U. S. 440 [25 L. Ed. 168]. As there is nothing to show that the findings of fact were unsupported by the evidence, we think they must be treated as conclusive. To the same effect are Crawford v. Neal, 144 U. S. 585, 596 [12 Sup. Ct. 759, 36 L. Ed. 552]; Furrer v. Ferris, 145 U. S. 132 [12 Sup. Ct. 821, 36 L. Ed. 649]."

See, also, Sandford v. Embry, 151 Fed. 983, 81 C. C. A. 167; Chauncey v. Dyke Bros., 119 Fed. 21, 55 C. C. A. 579; Murphy v. Southern Ry. Co., 115 Fed. 259, 53 C. C. A. 477; Walker v. Kinnare, 76 Fed. 101, 22 C. C. A. 75; Third National Bank of Philadelphia v. National Bank, 86 Fed. 852, 30 C. C. A. 436.

The master in chancery to whom the issues in the present case were referred reached the conclusion that the evidence in the two cases failed to substantiate the allegations of the bills of complaint; that at most it only showed that through stupidity or ignorance there may have been and probably was a slightly erroneous estimating of the amount and value of the reclamation work and improvements contained in the final proof depositions; that possibly as a fact the appellants in some particulars fell somewhat short of fulfilling all the requirements of the act of Congress, and the regulations of the Department of the Interior, to strictly entitle them to receive patents for the land; and that the testimony fell far short of proving that any er-

ror or misrepresentation was intentionally and knowingly made on that subject by the defendants or their witnesses, with the intent and purpose to deceive the officers of the United States, and fraudulently to obtain patents to the land. He therefore found that the allegations of the bills of complaint were not sustained by the evidence, and, as a conclusion, that both of said bills should be dismissed for failure of proof.

But it appears from the memorandum opinion filed in the case that the learned judge of the court below, although mindful of the rule in reference to the consideration to be given to a master's report where the issues are referred to him by agreement of the parties, was of the opinion that the master's report in this case disclosed its errors, and that it then became the duty of the court to itself examine the evidence and make findings and conclusions of its own. In the opinion of the court below the errors disclosed in the master's report were the following: (1) The master proceeded on the theory that the complainant was under the obligation to prove to the most minute particular every allegation of fraud set out in the bills, and, not having done so, he made his findings against it. (2) The report did not contain specific findings on each issue in the suits.

The stipulations of the parties and the orders of the court had created a special tribunal for the trial of the issues in these cases, subject to the direction of the court as to procedure. This the parties had the right to do, and if in the opinion of the court the master had failed to perform his duty with respect to the findings upon the material and substantial, as distinguished from the literal and immaterial, allegations of the bills of complaint, the proper practice was to order the causes resubmitted to the master with instructions to report findings upon the material and substantial allegations of the bills of complaint in accordance with the stipulations and orders of reference. The objection that the report did not contain specific findings on each issue appears to be based upon the failure of the master to find that certain allegations of the bills of complaint were true. These allegations of the bills of complaint were admitted by the answers to be true, and were, therefore, no longer issues in the cases. But if for the sake of fullness and completeness in the report findings upon such admitted allegations were deemed necessary, a re-reference for that purpose would have cured that defect in the report.

The appellants were entitled to the findings of the master upon the issues in accordance with the terms of the stipulations and the orders of reference, and if the master failed to report in accordance with such stipulations and orders of reference, and no such report was required by the court, it had the effect of depriving the appellants of a right secured to them by the stipulations entered into with the appellee. The remedy was then for the court to have ordered that the master report in accordance with the terms of the orders of reference, and no technical objection to the report should have been allowed to prevail over appellants' right under the stipulations. The attorney for the complainant did in fact move the court for an order of re-reference, but this motion was made secondary to an alternative motion first made to

permit the complainant to file exceptions to the report in the court. The court allowed this last-mentioned motion, and set aside the report, and thereupon proceeded to consider and determine the case as though no report had been made by the master. This we think was error. The causes should have been either re-referred for an amended report, or the report then before the court should have been considered on its merits with respect to material and substantial issues in accordance with the rule laid down in Kimberly v. Arms and Davis v. Schwartz, supra.

But-disregarding the feature of informality, and certain immaterial and unnecessary expressions in the master's report concerning the evidence, we think the findings should have been sustained.

[2] 2. In a number of decisions the Supreme Court of the United States has laid down inflexible rules respecting the weight and character of proof necessary to be adduced before a patent issued by the United States of America can be ordered delivered up and canceled on the ground of fraud. Probably the leading case on the subject is that of the Maxwell Land Grant, 121 U. S. 325, 381, 7 Sup. Ct. 1029 (30 L. Ed. 949). In that case Mr. Justice Miller said:

"We take the general doctrine to be that when in a court of equity it is proposed to set aside, to annul, or to correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal, and convincing, and that it cannot be done upon a bare preponderance of evidence, which leaves the issue in doubt. If the proposition, as thus laid down in the cases cited, is sound in regard to the ordinary contracts of private individuals, how much more should it be observed where the attempt is to annul the grants, the patents, and other solemn evidences of title emanating from the government of the United States under its official seal. In this class of cases, the respect due to a patent, the presumptions that all the preceding steps required by the law have been observed before its issue, the immense importance and necessity of the stability of titles dependent upon these official instruments, demand that the effort to set them aside, to annul them, or to correct mistakes in them should only be successful when the allegations on which this is attempted are clearly stated and fully sustained by proof. It is not to be admitted that the titles by which so much property in this country and so many rights are held, purporting to emanate from the authoritative action of the officers of the government, and, as in this case, under the seal and signature of the President of the United States himself, shall be dependent upon the hazard of successful resistance to the whims and caprices of every person who chooses to attack them in a court of justice; but it should be well understood that only that class of evidence which commands respect, and that amount of it which produces conviction, shall make such an attempt successful."

By a long line of decisions we find that this rule has been uniformly adhered to in the numerous suits instituted by the government to set aside its patents on the ground of fraud and misrepresentation. In the late case of United States v. Stinson, 197 U. S. 205, 25 Sup. Ct. 426, 49 L. Ed. 724, Mr. Justice Brewer stated the rule as follows:

"The government is subjected to the same rules respecting the burden of proof, the quantity and character of evidence, the presumptions of law and fact, that attend the prosecution of a like action by an individual. 'It should be well understood that only that class of evidence which commands respect, and that amount of it which produces conviction, shall make such an attempt successful.' Maxwell Land Grant Case, 121 U. S. 325 [7 Sup. Ct. 1015, 30 L.

214 F.—34

Ed. 949]; United States v. Iron Silver Mining Co., 128 U. S. 673, 677 [9 Sup. Ct. 195, 32 L. Ed. 571]; United States v. Des Moines, etc., Co., 142 U. S. 510 [12 Sup. Ct. 308, 35 L. Ed. 1099]."

There is another feature in this case that should not be overlooked. The complainant not only seeks to cancel the patents and forfeit the lands which had been in the possession of the appellants for more than ten years when the complaints were filed, but the effect of such a decree, under section 7 of the act of March 3, 1891 (26 Stat. 1098, c. 561 [U. S. Comp. St. 1901, p. 1521]), will be the forfeiture to the government of the amount paid by the appellants for such land, namely, $200 in one case, and $400 in the other case, and in addition all the improvements placed upon the land by the appellants. In United States v. Budd, 144 U. S. 154, 12 Sup. Ct. 575, 36 L. Ed. 384, the Supreme Court of the United States, speaking through Mr. Justice Brewer considered—

"the hardship of such a result, so different from that which is always enforced in suits between individuals, makes it imperative that no decree should pass against the defendants unless the wrong be clearly and fully established."

Measured by this clearly defined rule, we are not prepared to agree with the judge of the court below that the evidence in the present cases clearly and convincingly sustained the charges of the bills, and that the alleged wrongs were clearly and fully established.

[3] The allegations of fraud in the final proof testimony and depositions of the appellants and their witnesses, set forth in the bills, may be summarized under five general heads: (a) That the appellants did not own and did not control, and had not a clear right, or any right, to the use of water sufficient to irrigate the whole or any part of the lands, and for keeping the same, or any part thereof, permanently irrigated. (b) That water had not been conducted upon the lands, or any part thereof, from springs and their branches on and adjoining the lands, or any other source of supply; nor had the lands been reclaimed by the appellants. (c) That the appellants had not constructed ditches upon the land. (d) That the appellants had not expended in the cultivation and reclamation of the lands the sum of $3 per acre, or any amount. (e) That the lands had not been irrigated during the seasons of 1900, 1901, and 1902.

The testimony in the case is very voluminous, and the bounds of an opinion do not permit us to set it forth at any considerable length. We can only direct attention to portions of the testimony which we think clearly and substantially refute the allegations of fraud contained in the complainant's bills.

Leo Garrow, a witness for the appellants, testified that he lived about a mile and a half from the appellants; that the land that could be irrigated on the claim of William Connor was 75 acres; that he had seen springs on that entry, and also several irrigation ditches; that he had also observed on that claim some reservoirs, or remnants of reservoirs, that had been washed out; that the soil on the William Connor claim was a black loam, capable of raising crops, if irrigated; that it did not need any irrigating in the year 1907, for the reason that

the rainfall was sufficient to irrigate it; that he had seen the appellants irrigating; that he had seen them taking water from a reservoir, or something of that kind, and spreading it over the land; that he had also noticed some ditches on the Ida Connor claim; that he had seen some hay cut on one or the other of these two claims; and that he had seen grass growing on both of them as the result of. irrigation.

Eva Connor, a daughter of the appellants, testified that she knew of a reservoir on her father's claim; that it was built of dirt and rocks and timber; that she should judge that the reservoir was about 20 or 25 feet across; that it was washed out by the high water of 1907 and 1908; that she had also noticed four ditches on her father's claim; that she had seen water in those ditches from 1900 up until 1907; that she had seen water running over the ground from those ditches on her father's claim from 1900 up until 1907; that the appellants had gotten a good crop of hay from the claim in 1900, and every year from that time up until the present time; that she had seen hay stacked on her father's claim during each of those years; that the crops of hay were raised by irrigation. The witness further testified that she had seen three reservoirs on her mother's claim, and also four ditches; that she had seen water in them; that she had seen grass growing on her mother's claim, produced by irrigation, from 1900 to 1907; that she knew that hay was cut on her mother's claim every year from 1900 up until the present time; and that the hay was produced by irrigation.

Wesley Gibbons, a witness on behalf of the appellants, testified that he had known the appellants for 15 years; that out of the 160 acres in the N. W. ¼ of the section, known as the William Connor claim, he was pretty sure that at least 20 acres could be cultivated and plowed. This witness also testified that he had seen ditches on the land on both claims of the appellants since the year 1901.

James G. Allen, a witness for the appellants, testified that he resided on the William Connor section and about four miles from the home of the appellants: that he had lived there for 11 years; that from 60 to 75 acres of the Ida Connor claim were susceptible of irrigation; that it required 2 inches of water to the acre in that section of the country for irrigating purposes for hay land, on land similar to the Connor entries; that that was the usual and customary amount of water that was used in that section of the country for irrigation purposes, on land similar to the land of the appellants; that he believed the supply of water that he had seen on the Ida Connor claim was sufficient to irrigate the tillable land on that claim, so as to produce a paying crop of grain; that he had seen several springs on the William Connor claim in the years 1899, 1900, 1901, and 1902; that he had also seen two main ditches and several branches or laterals on that claim; that at some time during the years mentioned there were reservoirs on the William Connor quarter section; that he saw one on Spring creek and one in the vicinity of a big spring; that the reservoirs were about 20 feet wide, 8 feet deep, and about 200 feet long; that taking the dimensions and capacities of these two reservoirs, together with the ditches, the water supplied by them would be sufficient in ordinary seasons to irrigate the irrigable land on the William Connor

claim so as to produce a paying crop of hay; that he had seen water being distributed over the irrigable land on the William Connor claim in the years 1899, 1900, 1901, and 1902.

Maud Connor, a daughter of the appellants, testified that there were four ditches and one reservoir on her father's claim; that hay had been cut on both of the claims of the appellants ever since they had been interested in them; that she had seen hay stacked on her father's claim every year; that it was raised by irrigation and discing; that she had seen water from the ditches spread over the tillable land on her father's claim ever since 1900; that paying crops of hay had been raised on it every year by means of that irrigation. The witness further testified that she had seen four ditches and one reservoir on her mother's claim; that she knew of grass being raised on her mother's claim by means of irrigation ever since she had it; that the grass land was irrigated by the ditches; that she had seen water distributed by means of the ditches on her mother's claim over the tillable land.

Raoul Menard, a witness for the appellants, testified that he knew of two springs on the William Connor claim, and that he had seen where there was the appearance of being one reservoir; that he should judge that 70 or 75 acres of that claim could be plowed; that he had noticed three or four ditches on the claim; that he knew grass had been cut on that claim, and that he had seen it stacked there; that he thought there were two reservoir cites on the Ida Connor claim; and that probably 140 or 150 acres on the Ida Connor claim could be plowed or tilled.

Wallace Herbert Tyrrell, a witness for the appellants, testified that he had seen four ditches on the William Connor claim; that these ditches reached each one of the four 40's in that quarter section, or touched it at some point; that there was one reservoir on that claim; that he had seen water in it in 1900 and 1901; that he had also seen irrigating on that claim in 1900 and 1901; that he had seen 40 or 50 acres irrigated, with water on them, in 1901, the water being distributed by means of the ditches; that the tillable land on the William Connor claim was reclaimed by the system of irrigation which he had described; that from the system of irrigation on that claim there was water enough to irrigate the tillable land on the claim; that paying crops of hay were raised by means of irrigation from the ditches in 1900 and 1901, and that during those years hay had been cut on the William Connor claim and stacked thereon. The witness further testified that he had seen four ditches on the Ida Connor claim; that the system of irrigation which he saw on that claim would be sufficient to cover the tillable land on that claim; that he had seen 50 acres actually irrigated on the Ida Connor claim in 1900 and 1901; that grass was cut on that claim in 1900 and 1901; and that the land was irrigated in those years sufficient to produce paying crops of grass.

The appellant Ida Connor testified in her own behalf. During her testimony, and in connection therewith, there were introduced in evidence two certain notices of appropriation of water, from which it appeared that the appellant had appropriated 200 inches of water, 100 inches thereof from "southerly Spring creek" and 100 inches thereof

from "northerly Spring creek." It further appeared from the notices of appropriation of water that the purpose for which the water was claimed was for irrigating land, and for domestic, mechanical, and other useful purposes, and that the place of intended use was the S. ½ of section 20, township 15 N., range 4 W., in Lewis and Clark county, Mont., and other lands. This appellant testified that the charges of the government in its bill of complaint, with respect to false and fraudulent statements made in the affidavits of the appellants and their witnesses, concerning the irrigation of the land and the reclamation thereof, was a mistake on the part of the government; that the affidavits were true; that she did not make nor procure false affidavits for the purpose of imposing upon the land officers and fraudulently receiving a patent for the land, but that she and her husband had taken the land in good faith. The appellant further testified that there were three reservoirs on her claim and one on the claim of William Connor; that she considered the cost at about $100 each; that there was irrigating done on the claim of William Connor in the years 1901 and 1902; that she had seen hay cut and stacked on that claim during those years; that it was raised by means of irrigation; that paying crops of hay were raised on both claims during those years; that 20 acres of her husband's claim, and 40 acres of her own, might be plowed; that both she and her husband had expended $3 per acre for the total amount of acreage contained in their claims; that in her estimate of $3 per acre that had been expended on the land she had taken into consideration the ditches and the fences, but not the reservoirs, for the reason that the cost of the two former items was sufficient to make up that amount.

The appellant William Connor testified that he had expended $3 an acre and over for each acre of land on his claim; that this expenditure was for fences, ditches, and getting in water, and that he had done quite a lot of plowing, and built a reservoir, on his claim; that there was lots of water that came down from the hills, and it would stop at the reservoirs, and from the reservoirs he had ditches to run it over the land; that he had six or seven ditches on his claim; that from this system of ditches one might irrigate 40 or 50 acres; that he believed that he had irrigated every 40 of his claim, and that when he made final proof he had a ditch on every 40; that the first year he was on the place, 1900, he had an oat crop; that in 1900 and 1901, and in mostly every year since that time, he had stacked either natural hay or oat hay on his claim; that perhaps 60 or 70 acres on his place could be cultivated and plowed; that there were three reservoirs and four ditches on the claim of the appellant Ida Connor, two of the ditches being 375 yards long, one 400 yards long, and one 100 yards long, and that he built the three reservoirs on the claim of Ida Connor, and the reservoir on his own claim, in 1899 and 1900. The appellant testified that he had never tried to deceive the officers of the United States into giving him a patent for his land.

Two witnesses on behalf of the complainant, Edgar S. Foley and Henry J. Goodall, were special agents of the General Land Office authorized to examine the reclamation work on these two tracts of land,

which they did in April, 1909, and it was doubtless on their reports. that these two suits were brought in August, 1909. But the question before the court was not what was the condition of the reclamation, work in 1909, but what it was at the time final proof was made in August, 1901. The significance of this difference in time is made apparent by the testimony that there was a flood in this section of the country in June, 1908, which swept away substantially all of the improvements on these two tracts of land, so that the testimony of the special agents might be true as to the condition of the land in April, 1909, and not true as to its condition in August, 1901; and such seems to be the reasonable explanation of the conflict in the testimony in these cases.

In the face of such testimony, we cannot say that the presumptions. in favor of appellants' patents have been overcome, that the allegations. of the complaints have been proven by testimony clear, unequivocal, and convincing, and that the wrongs complained of have been clearly and fully established.

[4] 3. The act of March 3, 1877, known as the "Desert Land Act" (19 Stat. 377, c. 107 [U. S. Comp. St. 1901, p. 1548]), provides as follows:

"It shall be lawful for any citizen of the United States, or any person of requisite age 'who may be entitled to become a citizen, and who has filed his. declaration to become such' and upon payment of twenty-five cents per acre, to file a declaration under oath with the register and the receiver of the land district in which any desert land is situated, that he intends to reclaim a tract of desert land not exceeding one section, by conducting water upon the same, within the period of three years thereafter. * * * Said declaration shall describe particularly said section of land if surveyed, and, if unsurveyed, shall describe the same as nearly as possible without a survey. At any time within the period of three years after filing said declaration, upon making satisfactory proof to the register and receiver of the reclamation of said tract of land in the manner aforesaid, and upon the payment to the receiver of the additional sum of one dollar per acre for a tract of land not exceeding. six hundred and forty acres to any one person, a patent for the same shall be issued to him: Provided, that no person shall be permitted to enter more than one tract of land and not to exceed six hundred and forty acres which shall be in compact form."

On March 3, 1891, this act was amended (26 Stat. 1096), and there: was added thereto, among others, the following section:

"Sec. 5. That no land shall be patented to any person under this act un-- less he or his assignors shall have expended in the necessary irrigation, reclamation, and cultivation thereof, by means of main canals and branch ditches,. and in permanent improvements upon the land, and in the purchase of water rights for the irrigation of the same, at least three dollars per acre of whole tract reclaimed and patented in the manner following: Within one year after making entry for such tract of desert land as aforesaid the party so. entering shall expend not less than one dollar per acre for the purposes aforesaid; and he shall in like manner expend the sum of one dollar per acre during the second and also during the third year thereafter, until the full sum of three dollars per acre is so expended. Said party shall file during each year with the register proof, by the affidavits of two or more credible witnesses, that the full sum of one dollar per acre has been expended in such necessary improvements during such year, and the manner in which expended, and at the expiration of the third year a map or plan showing the character and extent of such improvements. If any party who has made such application,

shall fail during any year to file the testimony aforesaid the lands shall revert to the United States, and the twenty-five cents advanced payment shall be forfeited to the United States, and the entry shall be canceled. Nothing herein contained shall prevent a claimant from making his final entry and receiving his patent at an earlier date than hereinbefore prescribed, provided that he then makes the required proof of reclamation to the aggregate extent of three dollars per acre: Provided, that proof be further required of the cultivation of one-eighth of the land."

In the case of United States v. Mackintosh, 85 Fed. 333, 29 C. C. A. 176, the Circuit Court of Appeals for the Eighth Circuit had under consideration two suits the facts in which were strikingly similar to those involved in the case at bar. In these cases suits had been brought by the United States to vacate and set aside, on the ground of fraud, patents for lands entered under the Desert Land Act of March 3, 1877. The lands had been entered, and had passed to final proof, prior to the amendment of March 3, 1891. It was alleged in the bill of complaint in the Mackintosh Case (the bills in both cases were substantially the same), among other things, that at the time of final proof the claimant had testified that she owned and had a right to the use of water sufficient to irrigate the whole of the land and for keeping the same permanently irrigated, and that water had been conducted during one season upon the land so as to cover the whole thereof excepting about 10 acres; that the same had been irrigated and practically reclaimed from its desert condition; that there were ditches thereon, of a given depth and width, for conducting water, and that she had seen water distributed through the ditches. The bill further charged that the claimant had procured her witnesses at the time of making final proof to support her claim with affidavits containing substantially the facts set forth in her affidavit; and that the patent issued by the United States had been procured by the claimant through fraud, covin, and deceit in connection with the statements contained in the affidavits filed at the time of making final proof. In construing the Desert Land Act of March 3, 1877, the court said:

"In the search after fraud, the inquiry must be limited to such matters as the statute requires to be established in making the final proof. This proof is 'satisfactory proof to the register and receiver of the reclamation of said tract of land in the manner aforesaid.' 'The manner aforesaid' evidently refers back to the first clause, and to the words 'by conducting water upon the same.' This statute, of course, in all its provisions, should receive such construction as will reasonably carry out and effectuate the legislative intent. It was the manifest purpose of Congress to hold out to the citizens of the United States an inducement to reclaim the waste and desert lands of the public domain, and thus render them subservient to the uses of husbandry by process of irrigation. This was to be accomplished by such a system of ditches as would carry to the subdivisions of the land, capable of being reached by the surface flow, a supply of water such as, when let out of the ditches by drawgates or smaller ditches, might spread over the accessible parts, and stimulate vegetable life. If the main ditches were thus constructed, with the acquired adequate supply of water to irrigate the lands for the purpose of cultivation in the ordinary method of carrying it out over the surface of the ground, we think the reclamation contemplated by the statute was accomplished, without showing that this appropriation was followed by actual use and cultivation. This seems to be in accord with recent rulings of the land office department. Dickinson v. Auerbach, 18 Land Dec. Dep. Int.

16; Instructions of Secretary Teller to Commissioner McFarlan, 3 Land Dec. Dep. Int. 385. The courts, in dealing with the rights of settlers and locators under these land laws, have regard to the rulings and regulations of the department, when they do not contravene the letter and spirit of the statute. Orchard v. Alexander, 157 U. S. 383, 15 Sup. Ct. 635. [39 L. Ed. 737]."

The Circuit Court had dismissed both bills. The Circuit Court of Appeals affirmed the decrees in both cases. It is true that in the present case there must be considered in connection with the original act of March 3, 1877, the amendment of March 3, 1891. The act, as thus amended, has never been construed by the courts, but in the Case of Alonzo B. Cole, 38 Land Dec. Dep. Int. 420, the Secretary of the Interior, after quoting from the case of United States v. Mackintosh, supra, said:

"There is nothing contained in the amendatory act of March 3, 1891, which requires a character of reclamation different from that required by the original act, except that under the amendment an expenditure of $3 per acre must be shown, and one-eighth of the land embraced in the entry must be cultivated and so shown in final proof. * * * Cultivation of desert land without actual irrigation would be a useless proceeding, and inasmuch as the cultivation of the amount stated is required, it is also necessary that this area must have been actually irrigated by placing water upon it prior to final proof. Beyond this the rule should be as given in the court decision above quoted. Water in the arid regions is a valuable commodity, and its waste by the irrigation of lands unprepared for any agricultural use should not be required as a mere matter of proof that the lands can be watered from the system constructed. As a general rule, water rights in the Western states extend only to the amount of water 'beneficially used.' In fact, the Desert Land Act itself undertakes to limit the right to use water to the amount 'necessarily used'; and as the act requires only one-eighth of the land to be cultivated, prior to proof, and if no more than this amount be cultivated, it appears, generally speaking, that the flowing of water over the remaining portion would be unnecessary waste."

There is ample testimony tending to show that the irrigated and cultivated land on the claim of each of the appellants in this case exceeded the amount required by the act of Congress as amended.

The decrees of the court below are reversed, with directions to confirm the report of the master and dismiss the bills of complaint.