[Civ. No. 3556.  Second Appellate District, Division Two.—January 11, 1922.]

RAMER O. KENDALL, Respondent, v. SCHUYLER U. BUNNELL, Appellant.

[1] PUBLIC LANDS — SURVEY OF — POWER OF LAND DEPARTMENT TO CHANGE STATUS.—After public lands had been surveyed under the authority of the United States government, no declaration of the officers of the land department could operate to place them in the category of unsurveyed lands; neither can the land depart-

ment convey or refuse to convey public lands in disregard or in defiance of congressional enactment.

[2] ID.—APPROVAL OF PLAT—NECESSITY FOR—DATE OF SURVEY.—Until the plat of a survey has been approved by the United States surveyor-general there is no official survey, the date of the department's approval of the plat being treated as the date of the survey.

[3] ID.—RESURVEY OF LAND — DESCRIPTION IN APPLICATION — REFERENCE TO ORIGINAL SURVEY.—Where, pending the resurvey of desert lands, but prior to the approval of the plat thereof, a desert land application is made, it must be assumed, in the absence of anything in the application indicating a contrary intention, that the description therein contained was intended to refer to the original survey, as required by the instructions promulgated by the commissioner of the general land office relating to such land.

[4] ID.—ERRONEOUS ISSUANCE OF PATENT—ACTION TO DECLARE TRUST—BURDEN OF PROOF.—One claiming that a patent to desert land was erroneously issued to another, by reason of certain alleged erroneous legal conclusions on the part of the land department, and seeking to charge the patentee as trustee of the legal title for his benefit, must succeed, not upon the weakness of his adversary's title, but upon the strength of his own; and unless he shows affirmatively that he is entitled to the land, he cannot prevail.

[5] ID.—REJECTION OF APPLICATION—APPEAL—PROTECTION FROM INTERVENTION.—If a desert land application is improperly rejected by the local land officers, the applicant's appeal to the commissioner of the general land office operates to protect him from the intervention of any subsequent entry pending such appeal; but if such application is properly rejected by the local land officers, so that no inceptive right is initiated thereby, an appeal from their ruling will not affect the right of another to make application to enter the land.

[6] ID.—WITHDRAWAL OF APPLICATION — DISMISSAL OF APPEAL — EFFECT OF.—Where, after taking an appeal from the ruling of the local land officers, an applicant voluntarily withdraws his first application, and asks that his appeal be dismissed, the decision of the local land officers becomes final, the same as if no appeal had been taken, the appellate jurisdiction of the commissioner ceases, and any claim initiated by the original rejected application is abated.

[7] ID.—ALLOWANCE OF APPLICATION PENDING APPEAL — RIGHT TO CHALLENGE.—Plaintiff's original application, which was rejected by the local land officers, having initiated no inceptive right to the property in controversy, he is in no position to challenge the action of the land department allowing defendant's application

to enter the land prior to the dismissal of plaintiff's appeal—plaintiff having been a stranger to the title at that time.

[8] ID.—REJECTION OF APPLICATION TO COVERED LANDS—ABSENCE OF INCEPTIVE RIGHT.—The lands described in plaintiff's original application—if the descriptions therein be tied to the original government survey, which was the only official survey then in existence—having been covered by uncanceled entries that previously had been allowed by the local land office, such original application initiated no inceptive right, and such application was properly rejected.

[9] ID.—REFERENCE OF PENDING SURVEY—VIOLATION OF LAND DEPARTMENT REGULATION.—If it was plaintiff's intention to describe the land according to the resurvey that then was in progress, his application was in violation of the then existing department regulation that all applications to make desert land entries of any of the lands that were to be resurveyed "must describe the land with reference to the established lines of the original survey," and such application created no inceptive right in plaintiff.

[10] ID.—REGULATIONS OF LAND DEPARTMENT — POWER TO MAKE.—The land department may make any regulation, not inconsistent with the law, which is suitable to the execution of the land system with which Congress has intrusted it.

[11] ID.—DESCRIPTION BY REFERENCE TO ORIGINAL SURVEY—REASONABLE REGULATION.—The regulation of the land department requiring the lands to be described with reference to the established lines of the original survey, pending the completion of the new survey, was a reasonable and suitable regulation, in harmony with the statutes, and as such it had all the force of law.

[12] ID.—REFERENCE OF PRIOR VOID APPLICATION—DATE OF CREATION OF INCEPTIVE RIGHT.—Plaintiff's original application having been properly rejected by the local land officers, he could not tie a second application upon his first, and, by so doing, create an inceptive right to the land as of the date of the filing of the first application.

[13] ID.—RIGHT OF PREFERENCE—COMMENCEMENT OF WORK OF RECLAIMING—WHAT REQUIRED.—To entitle plaintiff to a preference under the act of March 28, 1908, which was amendatory of the "Desert Land Act," approved March 3, 1877, it was not sufficient to show that he took possession of the land and subjected it to his dominion, but it was necessary for him to show that "prior" to the resurvey he took possession of the land and commenced the work of conducting water upon the same.

[14] ID.—EFFECT OF RELINQUISHMENT — PREFERENCE RIGHTS NOT TRANSFERRED.—A relinquishment is but a release to the United States government of the claim of the entryman; therefore, any work done by an entryman, even though it be such as to constitute the commencement of work of conducting water upon the land,

will not, upon the execution of a relinquishment by such entry-man, inure to the benefit of a succeeding entryman, even though the latter has paid the former to execute such relinquishment and vacate the premises.

[15] ID.—MARKING OF CORNERS—POSTING OF NOTICE OF INTENTION TO RECLAIM—ABSENCE OF PREFERENCE RIGHT.—The placing by plaintiff of redwood posts at the corners of desert land in controversy, with notices thereon that plaintiff intended to reclaim the land from its desert state, may have constituted an act of possession, but such conduct did not constitute the commencement of the work of reclaiming the land by conducting water thereon, as required by the amendment of March 28, 1908, to the "Desert Land Act."

[16] ID.—RECLAMATION WORK ON PRIVATE LAND—PREFERENCE RIGHT TO ADJOINING PUBLIC LAND NOT CREATED.—Lands originally public cease to be public when they have been entered at the land office; and work of reclaiming land that, by reason of entry, has taken the character of private property, by conducting water thereon, cannot be treated as reclamation work done upon adjoining public land so as to create a preference right to the latter land under the amendment of March 28, 1908, to the "Desert Land Act."

[17] ID.—PERFORMANCE OF WORK AFTER SURVEY—ABSENCE OF PREFERENCE RIGHT.—The work done upon the land by plaintiff "after" the approval of the plat of the resurvey gave him no preference right under the act of March 28, 1908, amending the "Desert Land Act," approved March 3, 1877.

[18] ID.—KNOWLEDGE OF POSSESSION AND DOING OF WORK—ESTOPPEL TO MAKE APPLICATION.—The fact that defendant knew plaintiff was in possession of the land in controversy and had done work thereon did not estop defendant from making application to enter the land, where such application was filed prior to the filing by plaintiff of any application creating any inceptive right to the land and the work done by plaintiff was not such as to give him a preference right under the act of March 28, 1908, amending the "Desert Land Act," approved March 3, 1877.

APPEAL from a judgment of the Superior Court of Imperial County. Franklin J. Cole, Judge. Reversed.

The facts are stated in the opinion of the court.

C. L. Brown, Haines & Haines and Conkling & Brown for Appellant.

J. S. Larew and Phil D. Swing for Respondent.

FINLAYSON, P. J.—On June 1, 1915, a patent was issued to defendant for the land in controversy—a parcel containing almost 160 acres. According to the plat of the resurvey of certain lands in the Imperial Valley filed in the Los Angeles land office February 23, 1909, the land in controversy is the SE..¼ of the NW. ¼ and the NE ¼ of the SW. ¼ and lots 8 and 12 of section 7, township 16 south, range 16 east, San Bernardino base and meridian. Claiming that the patent was mistakenly issued to defendant by reason of certain alleged erroneous legal conclusions on the part of the land department, plaintiff brought this action to charge defendant as trustee of the legal title for his benefit. Judgment passed for plaintiff, and defendant appeals.

The patent was issued under, and each party bases his claim to the land upon, what is known as the "Desert Land Act," approved March 3, 1877 (19 Stats. at Large, p. 377 [U. S. Comp. Stats., secs. 4674–4676]), as amended by the acts of March 3, 1891 (26 Stats. at Large, p. 1096 [U. S. Comp. Stats., secs. 4677–4680]), and March 28, 1908 (35 Stats. at Large, p. 52 [U. S. Comp. Stats., secs. 4681–4683]). The original act of 1877, as amended by the act of 1891, provides that a qualified person, on payment of twenty-five cents per acre, may file with the register and receiver of the local land office a declaration under oath "that he intends to reclaim a tract of desert land not exceeding [320 acres], by conducting water upon the same within the period of three years thereafter. Said declaration shall describe particularly said [320 acres] if surveyed, and if unsurveyed, shall describe the same as nearly as possible without a survey. At any time within the period of three years after filing said declaration, upon making satisfactory proof to the register and receiver of the reclamation of said tract of land in the manner aforesaid, and upon the payment to the receiver of the additional sum of one dollar per acre for a tract of land not exceeding [320 acres] to any one person, a patent for the same shall be issued to him. Provided, that no person shall be permitted to enter more than one tract of land and not to exceed [320 acres] which shall be in compact form."

It will be noticed that, according to the provisions of the original act of 1877, as amended by the act of 1891, it was

permissible to enter unsurveyed as well as surveyed land, the act providing that, if the land be surveyed, the applicant's declaration shall "particularly" describe it—meaning, we have no doubt, that the declaration shall describe the land according to the lines of the government survey— and if the land be unsurveyed, the declaration "shall describe the same as nearly as possible without a survey." By the amendatory act of March 28, 1908 (35 Stats. at Large, p. 52 [sec. 4681]), it is provided that from and after the passage of that act "the right to make entry of desert lands . . . shall be restricted to surveyed public lands, . . . and no such entries of unsurveyed public lands shall be allowed or made of record."

This act of 1908 gives a preference right to *bona fide* settlers who have reclaimed or commenced the work of reclaiming unsurveyed desert land prior to the survey thereof. The provision for this preference right is as follows: "Any individual qualified to make entry of desert lands under said acts [the original act of 1877 and the amendatory act of 1891] who has, prior to survey, taken possession of a tract of unsurveyed desert land not exceeding in area three hundred and twenty acres in compact form, and has reclaimed or has in good faith commenced the work of reclaiming the same, shall have the preference right to make entry on such tract under said acts, in conformity with the public land surveys, within ninety days after the filing of the approved plat of survey in the district land office."

The land in controversy, located in what is known as the Imperial Valley, is a part of a large tract of desert land which, until comparatively recent times, was a barren waste that had originally been surveyed under the authority of the United States government in 1855. That survey was approved in 1856 and the approved plat thereof filed in the Department of the Interior and in the local land office in 1889. It is a matter of common knowledge that the lands embraced in this original survey of 1856, or the greater part thereof, remained unoccupied for many years. When, however, it was discovered that these apparently barren lands could be rendered exceedingly productive by means of irrigation, an extensive settlement of the valley began. By that time the monuments referred to in the field-notes of the 1856 survey had been almost entirely obliterated, and it

was difficult, and, in fact, in many cases impossible, to trace upon the ground the boundaries of the government subdivisions as established by that survey. . These conditions resulted in the making of several private surveys in an effort to define, in terms of the original government survey, claims to public lands. Many applicants to make entry of these lands under the desert land law, erroneously assuming that the lines of these private surveys coincided with the lost lines of the 1856 government survey, made unavailing efforts to enter public lands under descriptions obtained from the private surveys. In the case of *Herman H. Peterson et al.*, 40 Land Dec. 562, there may be found a graphic description of these deplorable conditions.

Moved, no doubt, by these unfortunate embarrassments and chaotic conditions in the Imperial Valley, Congress, in 1902, passed an act entitled "An act providing for the resurvey of certain townships in San Diego County, California" (32 Stat. 728). This was prior to the creation of Imperial County and at a time when the lands were in San Diego County. By this act, which was approved July 1, 1902, it was enacted "that the Secretary of the Interior be, and he is hereby authorized to cause to be made a resurvey of the lands in San Diego County, in the state of California, embraced in and consisting of the tier of townships 13, 14, 15 and 16 south, of ranges 11, 12, 13, 14, 15 and 16 east, and the fractional township 17 south, of ranges 15 and 16 east, all of San Bernardino base and meridian . . . ; provided, that nothing herein contained shall be so construed as to impair the present *bona fide* claim of any actual occupant of any of said lands to the lands so occupied."

Pursuant to this act of July 1, 1902, resurveys of the townships described were ordered, among others township 16, south, range 16 east—the township wherein is located the land in controversy. The resurvey of the township was made by United States Surveyor Henderson in 1904, the plat thereof was approved by the United States surveyor-general on November 4, 1908, and, as we have stated, was filed in the land office at Los Angeles on February 23, 1909.

The United States circuit court of appeals, in the case of *Cox* v. *Hart,* decided January 3, 1921 (270 Fed. 51), held that this act of July 1, 1902, was a legislative declaration that, until the resurvey should be made as authorized

thereby, the lands were to be regarded as unsurveyed lands, the court saying: "We are of the opinion that the court below properly held that at the time when the claims of the parties hereto were initiated the land was unsurveyed land. . . . The act of 1902 authorizing a resurvey was a legislative declaration that the lands were to be regarded as unsurveyed lands, that a new survey was to be substituted for the old, and that by the new survey the future disposition of the lands was to be regulated." That case, we are informed, has been taken to the United States supreme court, where it is now pending. Until the question shall have been decided by that tribunal, it cannot confidently be asserted that the act whereby Congress authorized such resurvey was or was not a legislative declaration that these lands should be regarded as unsurveyed lands until the new survey should be substituted for the old. It is earnestly contended by the respondent that the law is as declared by the United States circuit court of appeals, and that, from the date of the passage of the act of July 1, 1902, until the plat of the resurvey was duly approved, the land in controversy had the status of unsurveyed land for all purposes, and that for that reason he possessed, for ninety days after the filing of the approved plat of the resurvey, the preference right given by the act of March 28, 1908. Just as earnestly is it contended by appellant that the land has been "surveyed" land at all times since the plat of the original survey of 1856 was approved by the authorized department officers. It must be conceded that the argument advanced by appellant to sustain this contention possesses much cogency and persuasive force. However, as the sequel will show, the case can be decided without undertaking to pass upon this interesting question; and we, therefore, shall assume, for the purpose of this decision only, that from the date of the passage of the act authorizing the resurvey until the approval of the plat of the resurvey these lands had the status of unsurveyed lands, as held by the circuit court of appeals in the Cox case.

[1]  Unless the original survey of 1856 was abrogated by some act of Congress, such, for instance, as this act of July 1, 1902, so that, by congressional enactment, the lands resumed their original status of unsurveyed lands, no declaration to that effect by the officers of the land department

could operate to place them in the category of unsurveyed lands; for, though the administration of the public land system of the United States is intrusted to the land department, and the officers thereof, in the discharge of their official duties involving judgment or discretion, possess a wide latitude of discretionary authority, the department, nevertheless, cannot override the express will of Congress, and cannot convey or refuse to convey public lands in disregard or in defiance of congressional enactment. (*Burfenning* v. *Chicago etc. R. Co.*, 163 U. S. 321 [41 L. Ed. 175, 16 Sup. Ct. Rep. 1018, see, also, Rose's U. S. Notes].)

On March 30, 1906, which was before either party to this action had made any attempt to enter the lands in controversy, the commissioner of the general land office directed the register and receiver of the local land office "to suspend entries" in the townships the resurvey of which was directed by the act of July 1, 1902. On May 24, 1907, this order of suspension was modified by the general land office so as "to permit desert land entry thereof the same as though the lands were unsurveyed." It was further ordered by the commissioner of the general land office in these instructions of May 24, 1907, that "all applications for entries filed subsequent to March 31, 1906, must describe the land with reference to the established lines of the original survey, to be adjusted by legal subdivisions to the lines of the resurvey when established; and after resurvey, the entryman will be required to make proof in the form of an affidavit, corroborated, showing the legal subdivisions of this claim." That is, under the terms of the commissioner's instructions of May 24, 1907, every desert land entry was to be initiated in precisely the same manner as before the passage of the resurvey act of 1902, i. e., by an application describing the land by reference to the lines of the original survey; and, after being so initiated, the entry was to take the same course that it would have taken prior to the resurvey act of 1902, down to and including the final proof of reclamation, when, instead of issuing a patent describing the land in terms of the 1856 survey and as described by the entryman in his application to enter, it was intended that the land department at Washington, in order to adapt the final allowance of the entry and the description in the patent to the resurvey when completed, should withhold the issuance of the

patent until the resurvey should be made and the plat thereof approved and filed, and then, when that was done, the department would adjust the description in the entry to the lines of the resurvey and direct the issuance of a final receipt and patent describing the land according to such readjustment. Under date of August 8, 1907, the general land office, in a letter addressed to the register and receiver of the local land office, advised the latter that "these lands occupy the status of unsurveyed lands, for which reason you have been authorized to accept desert land entries therefor." This was prior to the passage of the act of March 28, 1908, whereby Congress declared that "no desert land entries of unsurveyed lands shall be allowed or made of record."

On March 20, 1909, defendant filed his desert land application for the land in controversy, describing it according to the resurvey, the approved plat whereof had been duly filed February 23, 1909. This application was allowed by the local land officers on May 31, 1910.

On May 20, 1909, plaintiff filed a desert land application whereby he sought to make entry of the land in controversy together with an adjoining parcel of approximately 160 acres designated on the plat of the resurvey as "Tract 87." This application, in so far as it related to the lands in controversy, was rejected by the local land officers for conflict with the application filed by defendant on the twentieth day of March preceding.

If the foregoing statement narrated all the facts there would be no question as to defendant's priority and his right to a patent. But, by reason of facts that we now are about to state, plaintiff claims that he has the prior right, and that, therefore, a patent should have been issued to him upon the completion of the acts required of him by the desert land law.

The facts which are determinative of the respective claims of the parties are substantially as follows: About March 1, 1908, plaintiff first examined the land in controversy, and found it uncultivated and unoccupied desert land claimed by one George T. Hammond, who, it seems, had plowed furrows around it and had cleared a small quantity of brush from the northeast corner. Hammond, whose application to enter the land had been rejected by the local land officers,

and who had taken an appeal from this decision of the register and receiver, executed and delivered to plaintiff, on March 3, 1908, in consideration of the payment of the sum of five hundred dollars, a relinquishment, which, plaintiff testified, was made out on the regular form of relinquishment furnished by the land office. On March 4, 1908, plaintiff set redwood posts at the corners of the land in controversy and posted thereon notices that he intended to reclaim it from its desert state.

On March 8, 1908, plaintiff filed his first desert land application—application No. 01487—wherein he described as follows the land of which he desired to make entry: "The land which I intend to reclaim is desert land and is described as follows: SE. ¼ of NW. ¼, NE. ¼ of SW. ¼, NW. ¼ of SE. ¼ and S. ½ of NE. ¼ and NE. ¼ of NE. ¼, Sec. 7, and W. ½ of NW. ¼, Section 8, Township 16 South, Range 16 East, San Bernardino Meridian, containing 320 acres, situated in Imperial County, State of California."

At the time when plaintiff filed this application No. 01487, the plat of the resurvey had not been approved. At that time, therefore, there was no resurvey. **[2]** Until the plat of a survey has been approved by the United States surveyor-general, there is no official survey, the date of the department's approval of the plat being treated as the date of the survey. (*Medley* v. *Robertson,* 55 Cal. 396; *Garfield* v. *Wilson,* 74 Cal. 175 [15 Pac. 620]; *United States* v. *Curtner,* 38 Fed. 1.) "There is, in fact, no such tract of land as that described in the petition until it has been located within the congressional township, by an actual survey and establishment of the lines, under the authority of the United States, *and the survey has been approved by the proper United States surveyor-general.* 'A person may approximate to the lines that may be run—may surmise the precise lines— but the tract has no separate legal identity until the survey is made *and approved* under the authority of Congress." (*Middleton* v. *Low,* 30 Cal. 605.) (Italics ours.)

**[3]** There is nothing on the face of plaintiff's application No. 01487, filed by him March 8, 1908, to indicate that the description therein was intended to refer to any survey other than an official government survey. The only official survey that theretofore had been made was the original

survey of 1856. In the absence of anything in the applica-
tion itself to indicate a contrary intention, it should be
assumed, as evidently it was by the local land officers, that
the application was made in compliance with the instruction
theretofore promulgated by the commissioner of the general
land office that "all applications for entries filed subsequent
to March 31, 1906, must describe the land with reference to
the established lines of the original survey." "When the
resurvey of the Imperial Valley was undertaken by the
government, desert land entries were permitted therein as
for unsurveyed land, but applicants were required to describe
the tracts desired by them according to the original sur-
vey." (*Stephenson* v. *Pashgian*, 42 Land Dec. 115.)

It is manifest that the register and receiver of the local
land office construed plaintiff's application of March 8,
1908, as describing the land according to the original sur-
vey of 1856—the only construction of which it was properly
susceptible in view of the fact that at that time the origi-
nal survey of 1856 was the only official survey that ever
had existed. So construing plaintiff's application No.
01487, the local land officers rejected it on March 10, 1908,
upon the ground that the land office records showed that
each subdivision referred to in plaintiff's application was
covered by a prior uncanceled desert land entry with which
plaintiff's application conflicted. On the trial in the court
below, the records of the local land office were introduced
in evidence. They showed that such prior desert land en-
tries had been made and that the same were uncanceled at
the date of plaintiff's application No. 01487. In rejecting
plaintiff's application, the register and receiver also notified
plaintiff that "the relinquishment of George T. Hammond
to lands described by metes and bounds does not clear the
record in any respect, as such applications cannot be ac-
cepted, under instructions from the General Land Office,
and therefore have no standing on our records."

On April 9, 1908, plaintiff appealed to the commissioner
of the general land office from the decision of the local land
officers rejecting his application No. 01487. In this appeal,
plaintiff, after referring to the fact that the work of sec-
tionizing the townships in the field, under the congressional
authority for the resurvey, had been in progress for several
months and was then completed, says: "The land applied

for by appellant is properly described by the new official survey which shortly will be established as the official correct government survey of the lands in this district.'' So far as is disclosed by anything of record in the land department, this is the first intimation that plaintiff's application was intended by him to describe the lands applied for according to the resurvey, which, though then in progress, was not completed for the reason that at that time no plat of the resurvey had been approved by the United States surveyor-general. If the description in plaintiff's application were read as though the township and section lines therein mentioned were the same as the correspondingly numbered township and section lines of the resurvey, the plat whereof was subsequently approved and filed in the local land office, then plaintiff's application of March 8, 1908, would include the land in controversy and also the adjoining tract of approximately 160 acres designated on the plat of the resurvey as ''Tract 87.''

At the time when plaintiff filed his application of March 8, 1908, the 160 acres comprising the land known under the resurvey as Tract 87 were covered by a prior desert land entry made by one Mary E. Gray. This tract of land, lying to the east of and adjoining the land in controversy, was described in Mary E. Gray's entry as the northwest quarter of section 12. It seems that in her application to make entry of this adjoining tract, Mary E. Gray described the land, or at least attempted to describe it, according to the established lines of the original survey, as required by the instructions issued by the commissioner on May 24, 1907. On June 16, 1908, plaintiff filed in the local land office a contest of the entry that Mary E. Gray had made of this tract of 160 acres adjoining the land in controversy. This contest was made by plaintiff upon the ground that no reclamation work had been done by Mrs. Gray or her heirs during the first year succeeding her entry. Plaintiff made the contest for the purpose of clearing the record so that he could file on the entire 320 acres, i. e., the land in controversy, containing approximately 160 acres, and the 160 acres comprising what is now known as Tract 87. As the result of this contest, the Gray entry was canceled April 30, 1909. In the court below plaintiff testified, in substance and effect, that he knew, when he filed his desert land

application No. 01487 on March 8, 1908, that approximately one-half of the land that he applied for, namely, the 160 acres contained in what is now described as Tract 87 on the plat of the resurvey, was covered by Mrs. Gray's prior entry; that he expected that, as to this part of the entire 320 acres, his application would be rejected, and that in that event he would take an appeal, intending during the pendency of the appeal to contest Mary E. Gray's prior entry, and, if successful in that contest, to eventually have his application allowed for the two tracts, viz., the land in controversy and the 160 acres now known as Tract 87.

As already stated, the plat of the resurvey was approved by the United States surveyor-general on November 4, 1908, and was filed in the local land office February 23, 1909. Thereafter, to wit, on March 20, 1909, and during the pendency of the appeal to the commissioner of the general land office from the decision of the local land officers rejecting plaintiff's application of March 8, 1908, defendant, as we have stated, filed his application to make a desert land entry of the lands in controversy. All action upon defendant's application was suspended until after plaintiff had withdrawn his appeal from the rejection of his application of March 8, 1908.

It was on March 3, 1909, that defendant first inspected the land in controversy. At that time he saw plaintiff's notices on the northeast corner of the land. He also, on March 16, 1909, saw plaintiff's employee doing some leveling work with a two-horse team and a Fresno scraper. So that, when, on March 20, 1909, he made application to enter the land in controversy, defendant knew that plaintiff was making some claim thereto.

Plaintiff's contest of the Gray entry having been decided in his favor on April 30, 1909, and the land covered by that prior entry—the land designated on the resurvey plat as Tract 87—being then clear on the record, plaintiff, on May 20, 1909, filed a new application—application No. 06233—whereby he sought to make a desert land entry covering the lands in controversy and Tract 87. In this application of May 20, 1909, plaintiff asks a dismissal of his appeal from the decision of the local land officers rejecting his prior application of March 8, 1908. Plaintiff's second application contains the following: "I made an ap-

plication for entry on this same land March 9, 1908 [should be March 8, 1908], which was rejected on account of survey, from which ruling I appealed. I now desire said appeal dismissed and said application of March 9 [*sic*], 1908, withdrawn.'' Plaintiff accompanied his new application with a document, duly signed and filed, which, after referring to his attempted entry of March 8, 1908, and his appeal from the decision of the local land officers rejecting his first application, concludes by stating that he ''now desires to have said appeal dismissed, and said application of March 9th [*sic*], 1908, withdrawn, *and does hereby withdraw said application, and respectfully asks that the said appeal be dismissed.''* (Italics ours.)

During the course of the trial in the court below defendant put in evidence Serial Register No. 1 of the local land office at Los Angeles, showing entries under the number 01487—the number of plaintiff's first application, the application that was made by him on March 8, 1908. One of these entries reads: ''1909. May 20. Application and appeal withdrawn.''

The register and receiver of the local land office evidently considered that plaintiff's new application No. 06233, filed May 20, 1909, and its accompanying document, constituted a voluntary dismissal of the appeal that he had taken from the rejection of his original application of March 8, 1908. For, on May 31, 1910, defendant's application, action whereon had been suspended pending plaintiff's appeal, was allowed by the local land office.

On October 12, 1910, the commissioner of the general land office at Washington wrote to the register and receiver of the local land office at Los Angeles advising the latter that on May 20, 1909, plaintiff had filed in the local land office ''a statement signed by the applicant, dated May 18, 1909, wherein he requests 'to have said appeal dismissed and said application of March 9 [8], 1908, withdrawn.' In view of this statement of the claimant, which is now on file in this office, the application is hereby finally rejected, the appeal dismissed, and the case closed. You will make proper notations on your records.''

Upon the foregoing state of facts a hearing before the register and receiver of the local land office was ordered by the commissioner of the general land office to determine

the rights of the respective claimants—the litigants in the present action. A trial was had before the register and receiver, resulting in a decision by those officers recommending that defendant's entry be canceled and plaintiff's application to enter be allowed. On an appeal by defendant to the commissioner of the general land office, the decision of the local land officers was affirmed. Whereupon defendant took an appeal to the Secretary of the Interior. For the reasons set forth in a written opinion handed down by the first assistant secretary, the decision of the commissioner affirming that of the local land officers was reversed, and it was adjudged that defendant's entry of the lands in controversy should remain intact, without prejudice to plaintiff's right to complete his claim for the adjoining 160 acres in Tract 87. Thereafter the patent was issued to defendant, and in due time this action was commenced to have it declared that, as patentee, defendant holds the legal title in trust for plaintiff.

From the written opinion of the first assistant secretary it appears that plaintiff, in his contest in the land department, contended: (1) That on the date of the filing of defendant's application, a previous application by plaintiff for the land in controversy, together with Tract 87, was pending on an appeal from its rejection by the local land officers; (2) that plaintiff acquired a preference right of entry by virtue of work performed on the land prior to the filing of the plat of the resurvey on February 23, 1909; and (3) that defendant was chargeable with knowledge of plaintiff's claim to the land based upon his alleged purchase of the rights of Hammond and the performance of work, subsequent to the filing of the plat of the resurvey, looking to the reclamation of the land. For reasons set forth in his opinion, the secretary decided adversely to plaintiff upon each of these three contentions, and the latter now claims that, in so deciding, errors of law were committed by the secretary entitling plaintiff to the relief that he seeks by this action. These three points are the ultimate questions of law presented for our determination by this appeal; and if none of them be tenable, then the judgment of the court below adjudging that defendant holds the legal title in trust for plaintiff must be reversed.

Before proceeding to a discussion of the three propositions which plaintiff claims were erroneously decided against him by the Secretary of the Interior, there is a further question that needs consideration. Plaintiff claims that because the Secretary of the Interior, in deciding against his contentions, gave his reasons therefor in a written opinion, no objection to his application to enter the land may be urged by defendant in this action that the land department itself did not make. In support of this proposition plaintiff cites us to *Northern Pac. R. Co.* v. *Trodick,* 221 U. S. 208 [55 L. Ed. 704, 31 Sup. Ct. Rep. 607, see, also, Rose's U. S. Notes], where it was said: "It is not for the railway company, to which was wrongfully issued a patent, to make an objection to Trodick's claim which the land office did not make." In that case the appellants claimed under a patent that had been issued to the railway company under a railway land grant. On behalf of Trodick, the appellee, it was shown that, while the land was unsurveyed and prior to the filing of the railroad company's map of definite location, Trodick's grantor had occupied the land with the *bona fide* intent to acquire title from the United States under the homestead laws just as soon as a government survey should be made. By the terms of the Land Grant Act it was provided, in effect, that land within the limits of the grant should not pass to the railway company if, when the map of definite location should be filed, it was occupied by a homestead settler who, in good faith, intended to acquire title under the federal laws. For this reason the United States supreme court held that, because of the occupancy of the land by Trodick's grantor, the title did not pass by the congressional grant to the railway company, but was excepted from its operation, and the railway company did not acquire, and could not acquire, any interest whatever in or to this particular tract of land by reason of the definite location of its line of railway. In other words, the railway company was at all times a total stranger to the land, and, of course, as such stranger had no right to object to any action that might be taken by the land department in recognition of Trodick's right to acquire the title from the United States under the homestead laws. That case has no application here. There, neither the railroad company nor its grantees possessed any

right that could intervene between the government and Trodick's claim to title. Here, if defendant's position be tenable, he did initiate a right that intervened between the completion of the resurvey and plaintiff's second application. Defendant, to whom the patent was issued, initiated an inceptive right to the land on March 20, 1909, when he filed his application to make entry under the Desert Land Act, unless, prior thereto, plaintiff had initiated a prior and superior right which he is now in a position to assert. The burden is upon plaintiff to show that he did acquire such prior and superior right. [4] For it is the settled rule that in actions of this character the plaintiff must succeed, not upon the weakness of his adversary's title, but upon the strength of his own; and unless he shows affirmatively that he is entitled to the land, he cannot prevail. (*Bohall* v. *Dilla,* 114 U. S. 47 [29 L. Ed. 61, 5 Sup. Ct. Rep. 782]; *Sparks* v. *Pierce,* 115 U. S. 408 [29 L. Ed. 428, 6 Sup. Ct. Rep. 102]; *Lee* v. *Johnson,* 116 U. S. 48 [29 L. Ed. 570, 6 Sup. Ct. Rep. 249, see, also, Rose's U. S. Notes].) In *Bohall* v. *Dilla, supra,* the court said: "To charge the holder of the legal title to land under a patent of the United States as a trustee for another, and to compel him to transfer the title, the claimant must present such a case as will show that he himself was entitled to the patent from the government, and that, in consequence of erroneous rulings of the officers of the land department upon the law applicable to the facts found, it was refused to him. It is not sufficient to show that there may have been error in adjudging the title to the patentee. It must appear that by the law properly administered the title should have been awarded to the claimant."

Turning now to the three questions respecting which respondent claims that the Secretary of the Interior erred: The first contention advanced by respondent to support the judgment of the lower court is that the land department fell into an error of law when it held that the appellant here could acquire a superior right to the land by filing an application therefor pending respondent's appeal to the commissioner from the rejection of his first application—his application No. 01487, presented for approval March 8, 1908, and rejected by the local land officers on March 10, 1908.

56 Cal. App.—9

[5] If, as respondent. claims, his first application was improperly rejected by the local land officers, then his appeal to the commissioner of the general land office operated to protect him from the intervention of any subsequent entry pending his appeal from the adverse decision of the local land officers. But if, as we think is the case, plaintiff's first application—his application of March 8, 1908— was properly rejected by the local land officers, so that no inceptive right was initiated thereby, then his appeal to the commissioner did not affect defendant's right to make application to enter the land. That is, if for any reason whatever plaintiff's first application failed to initiate any inchoate right, then it was proper for the land department to pursue the course that it did, namely, receive defendant's application, suspend it pending plaintiff's appeal, and, upon plaintiff's voluntary withdrawal of his appeal, allow defendant's application. It will be recalled that on May 20, 1909, when he filed his second application, plaintiff incorporated into the documents then signed by him and filed in the local land office these words: "I made application for entry on this same land March 9, 1908 [should be March 8, 1908], which was rejected on account of survey, from which ruling I appealed. I now desire said appeal dismissed and said application of March 9 [*sic*], 1908, withdrawn"; also that he "*does hereby withdraw said application,* and respectfully asks that the said appeal be dismissed." [6] Having thus voluntarily withdrawn his first application, and having asked that his appeal from the judgment of the register and receiver be dismissed, the decision of those officers became final, the same as if no appeal had been taken, the appellate jurisdiction of the commissioner ceased, and even if plaintiff had initiated any claim by his original application, such claim would have been abated by his own act. (*Smith* v. *Lovell,* 4 Land Dec. 267; *Spratt* v. *Edwards,* 15 Land Dec. 290; *Hughey* v. *Dougherty,* 9 Land Dec. 29.)

The notion that an appeal from a decision that properly rejects an application to make entry bars the right of any other qualified person to file an application pending such appeal was vigorously repudiated by the land department in an opinion filed in *Miller* v. *Robertson,* 35 Land Dec. 136, where it was said: "It is the existence of a record entry

which prevents the acceptance of an application for the same land and not the mere filing of a prior application. (*Berry* v. *Towner*, 21 Land Dec. 434.) Any other practice would open the door to sharp practice and possible injustice. If all applications presented after the offering of a prior pending one were to be unqualifiedly rejected, any person, though totally disqualified, by being first in time would be able to tie up the disposition of the land until final action was taken on his application and thereby be afforded opportunity to speculate upon a right to which in equity and justice he was not entitled. The department will never adopt a rule or sanction a practice tending to create or protect a mere claim of right not capable of perfection, in order that it may be made the subject of speculative traffic, to the possible injury of those who in good faith are seeking to exercise a valid right.''

[7] It is suggested that, because plaintiff's appeal from the decision of the local register and receiver rejecting his first application was not formally dismissed by the commissioner of the general land office until October 12, 1910, the allowance by the local land officers, on May 31, 1910, of defendant's suspended application was premature. The answer to this is that, if plaintiff's first application initiated no inceptive right whatever, then, as a stranger to the title at the time of the allowance of defendant's application, he is in no position to challenge the action of the land department allowing defendant's application to enter the land, even should we concede, which we do not, that plaintiff's appeal was not completely terminated when he asked for its dismissal and voluntarily withdrew the sole basis for the appeal—his original application to make entry. Respondent cites us to *Germania Iron Co.* v. *James,* 89 Fed. 811, where it was said that after the Secretary of the Interior has decided that ''a former *entry* was void and should be canceled, no subsequent entry of the land could be made until that decision was officially communicated to the local land officers, and a notation of the cancellation was made on their plats and records.'' (Italics ours.) That case has no application here. In the instant case, plaintiff had made no entry prior to defendant's application. Plaintiff's application to enter the land had been rejected, and, as we think, properly rejected. The land, therefore, had not

been segregated from the mass of public lands when defendant made his application. It was then a part of the public domain. In the Germania Iron Company case the prior entry, until set aside by the secretary on the appeal from the local land officers, was an appropriation of land which, by reason of the existence of the uncanceled entry, took on the character of private property until the decision on appeal became effective by being communicated to the local officers and noted by them on their records. (*Hastings & D. R. Co.* v. *Whitney,* 132 U. S. 357 [33 L. Ed. 363, 10 Sup. Ct. Rep. 112, see, also, Rose's U. S. Notes].) There is no such situation here. Plaintiff had made no prior entry; and unless his rejected application initiated some inchoate right, he is in no position to challenge the allowance of defendant's application to enter the land.

In holding that plaintiff's appeal from the decision of the local land officers did not prevent the filing of defendant's application, nor prevent its acceptance by the local land officers when plaintiff voluntarily withdrew his original application, we have proceeded upon the hypothesis that plaintiff's first application was wholly futile and ineffective to initiate any inchoate right whatever. The next question, therefore, is: Did plaintiff's original application initiate any inceptive right? If it did not, then, for the reasons already stated, the Secretary of the Interior did not fall into error when he held that defendant acquired a superior right notwithstanding his application to enter the land was filed pending the appeal from the rejection of plaintiff's original application.

As we already have pointed out, on March 8, 1908, when plaintiff presented his first application to the local land officers—application No. 01487—no resurvey of these Imperial Valley lands had been made. It was not until some time later that the plat of the resurvey was approved by the United States surveyor-general. And, as we have shown, a government survey dates from the approval of the plat. Until then there is no official survey. Moreover, by a duly promulgated regulation of the department, in force at the date of plaintiff's first application, all applications to make desert land entries of these lands were required to "describe the land with reference to the established lines of the original [1856] survey." There was nothing on the face

of plaintiff's application of March 8, 1908, to suggest that the land therein mentioned was not described according to the old survey, as required by the department regulation. The local land officers, therefore, were justified in treating the description as referring to the 1856 survey. Indeed, under the circumstances no other construction would have been warranted. The land is described in the application with reference to the lines of the 1856 survey, or it is not described at all.

If we treat plaintiff's first application as describing the land according to the 1856 survey—and no other construction is permissible—then, for two reasons at least, the application failed to initiate any right to the lands in controversy. One reason is that plaintiff's first application, if it be read as intending to describe the lands applied for according to the lines of the old survey, does not describe the land in controversy. The description in plaintiff's first application can be made to fit the land in controversy only by treating it as referring to the lines of the subsequently approved resurvey, the plat whereof was not filed until February 23, 1909. But that, for the reasons stated, we may not do. The application must be read as though the section and township lines therein referred to are the section and township lines delineated on the plat of the 1856 survey. It is common knowledge that, in so far as it has been possible to locate on the ground any of the lines of the original survey, those lines have generally been found to be far apart from the correspondingly numbered township and section lines of the new survey. Indeed, in the instant case we have some evidence, though it may not be of the most satisfactory character, that the lands in controversy are not located in either of the sections referred to in plaintiff's original application—sections 7 and 8—if that application be taken as referring to the 1856 survey— the only survey to which it may properly be deemed to refer. The land in controversy lies immediately west of the 160 acres, which, on the plat of the resurvey, are now known as Tract 87. Tract 87, according to the resurvey, is partly in section 7 and partly in section 8. Mary E. Gray's application, which described the land that is now known as Tract 87, described it as being in section 12. It is conceded that her application described, or, at any rate,

attempted to describe, the land according to the lines of the 1856 survey. It thus will be seen that Tract 87, which lies in sections 7 and 8, according to the resurvey, was in section 12, according to the 1856 survey, if we assume that Mrs. Gray's application gave the correct township and section lines according to the original survey. If it did, then, manifestly, plaintiff's first application did not describe the land in controversy if it be deemed to describe the lands applied for according to the lines of the old survey. But, entirely apart from this consideration, there is, as we have said, a second and a conclusive reason why plaintiff's first application initiated no inceptive right, if we regard the description therein as referring to the 1856 survey. [8] That reason is this: All the lands described in plaintiff's first application, if the description therein be tied to the 1856 survey, were covered by uncanceled entries that previously had been allowed by the local land officers. It was upon this ground that the local land officers rejected plaintiff's original application. So long as these prior entries remained subsisting entries on the record, no subsequent entry could be made of any subdivision covered by any of such prior entries. Each of these prior entries was, on its face, a valid entry; and while it remained uncanceled no subsequent applicant to make entry could acquire any inceptive right whatever. (*Hastings & D. R. Co.* v. *Whitney, supra; Hodges* v. *Colcord,* 193 U. S. 192 [48 L. Ed. 677, 24 Sup. Ct. Rep. 433]; *McMichael* v. *Murphy,* 197 U. S. 304 [49 L. Ed. 766, 25 Sup. Ct. Rep. 460, see, also, Rose's U. S. Notes].)

[9] If it were permissible to read plaintiff's *original application in the light of his then undisclosed intention to describe the land according to the resurvey that then was in progress, and if, so reading the application, it were permissible to hold that it was intended to and does describe the lands by reference to the lines of the subsequently approved resurvey, nevertheless, such application would not create any inceptive right in plaintiff. For, so construed, the application would violate the then existing department regulation that all applications to make desert land entries of any of the lands that were to be resurveyed "must describe the land with reference to the established lines of the original survey." [10] The land department may

make any regulation, not inconsistent with the law, which is suitable to the execution of the land system with which Congress has intrusted it. (*Caha* v. *United States,* 152 U. S. 211 [38 L. Ed. 415, 14 Sup. Ct. Rep. 513]; *United States* v. *Smull,* 236 U. S. 405 [59 L. Ed. 641, 35 Sup. Ct. Rep. 349, see, also, Rose's U. S. Notes]; *United States* v. *Hearing,* 26 Fed. 744.) [11] That the regulation requiring the lands to be described with reference to the established lines of the original survey, pending the completion of the new survey, is in harmony with the statutes, and is such as is reasonably necessary and proper to be observed in the administration of the system that Congress has established for the disposition of public lands, cannot admit of doubt. At that time there were few, if any, natural monuments on these desert wastes whereby the land that an applicant might desire to reclaim could be identified for the purpose of making an entry in the land office. Therefore, the only practicable means for identifying the land was to make reference to some survey. There was no resurvey then in existence, nor could there have been until the plat of the resurvey should be approved by the duly empowered government official. It was not practicable for the government to rely upon a private survey. Unless, therefore, the department should entirely suspend all right to make application to enter these lands under the Desert Land Act, until the resurvey should be made and approved by the proper United States surveyor, the only practicable means for identifying any land for the purposes of a desert land entry was to pursue the course that was prescribed by this department regulation, that is, to describe the land that the applicant desired to reclaim by a reference, as nearly accurate as the circumstances might permit, to the lines of the only official survey that ever had any existence prior to the resurvey, viz., the 1856 survey, and then, when the resurvey should be made, adjust the entry to the lines of the new survey. For these reasons the regulation was a reasonable and suitable regulation, and as such it had all the force of a law. (*United States* v. *Thurston,* 143 Fed. 287, 291 [74 C. C. A. 425]; *Peters* v. *United States,* 2 Okl. 116 [33 Pac. 1031].) This being so, any claim by plaintiff that his original application describes the lands according to the lines of the resurvey that then

was in progress is self-destructive. It is a claim that at once negatives the creation of any inceptive right to the land by disclosing a willful and fatal disregard of a binding and valid regulation of the land department that had all the force of law. "If the applicant was guilty of any violation of the law, such violation vitiated the proceeding *in toto.* . . . Here there was a distinct violation of the law on the part of the entryman, and one which vitiated the application as a whole." (*Hyde* v. *Bishop Iron Co.,* 177 U. S. 281, 288, 289 [44 L. Ed. 771, 20 Sup. Ct. Rep. 592, 594, see, also, Rose's U. S. Notes].)

[12] Respondent contends that his second application—application No. 06233, presented to the local land officers May 20, 1909, and subsequently to defendant's application—was not a voluntary withdrawal of his first application, but was ancillary thereto and a continuation thereof. Any attempt thus to tie respondent's second application to his first, and, by so doing, create an inceptive right to the land in controversy as of the date of the filing of the first application—an application that was rejected, and properly rejected, by the local land officers within a day or so after its presentation—must meet with failure. Respondent's second application, filed after the approval of the plat of the resurvey, describes the land in controversy by reference to the township and section lines of the new survey. Whereas, as we have shown, the description in respondent's first application must be held to be according to the lines of the original, or 1856, survey. The result is that the two applications describe different lands—if the local land officers properly allowed Mrs. Gray's application as correctly describing the 160 acres adjoining the lands in controversy on the east. Respondent's second application was, therefore, an independent transaction, and an attempt to secure other and different land after the intervening of appellant's right thereto.

For the foregoing reasons it must be held that the Secretary of the Interior did not err in holding that defendant could acquire a superior right to the land in controversy notwithstanding plaintiff's appeal from the decision of the local land officers rejecting his first application.

Respondent's next claim is that the Secretary of the Interior erred in holding that he did not acquire a preference

right under the act of March 28, 1908. That act, it will be recalled, provides that any qualified individual "who has, prior to the survey, taken possession of a tract of unsurveyed desert land, not exceeding in area three hundred and twenty acres in compact form, and has reclaimed or has in good faith commenced the work of reclaiming the same, shall have the preference right to make entry of such tract . . . within ninety days after the filing of the approved plat of survey in the district land office." Respondent's first application to enter the land, filed March 8, 1908, was filed prior to the approval of the resurvey, and at a time when, according to respondent's theory, the lands were unsurveyed lands. At the time when respondent filed his first application—March 8, 1908—there was no act of Congress giving a preference right. The act that gives such right to one who conforms to the prescribed requirements, the act of March 28, 1908, was not passed until twenty days after plaintiff made his first application. So that, if he ever exercised the preference right which he claims was accorded him by this act of March 28, 1908, it was when he filed his second application on May 20, 1909, and not when he filed his first on March 8, 1908.

Respondent's argument runs substantially as follows: The act of July 1, 1902—the act providing for the resurvey—was a legislative declaration that the lands to be resurveyed are to be regarded as unsurveyed lands until they shall have been resurveyed and the plat of the resurvey duly approved—invoking in support of this position the decision of the United States circuit court of appeals in *Cox* v. *Hart, supra;* beginning with his purchase of the Hammond relinquishment on March 3, 1908, and until he made his second application on May 20, 1909, he was in possession of the land in controversy, and, so he claims, had commenced in good faith the work of reclaiming the land prior to the resurvey and while the lands were still in the category of unsurveyed lands; therefore, so his argument runs, he had a preference right to make entry at any time within ninety days after the filing of the approved plat of the resurvey, that is, until May 24, 1909; and, since his second application was filed on May 20, 1909, or four days before the expiration of the ninety days, he thereby, in the due exercise of his preference right, so it is claimed, initiated

an inchoate right superior to any that might have accrued to appellant under the application that the latter filed March 20, 1909.

For the purposes of this decision we shall assume that the land had the status of unsurveyed land from the date of the passage of the resurvey act of 1902 and until the filing of the approved plat of the resurvey on February 23, 1909, or at least until the resurvey was approved by the United States surveyor-general on November 4, 1908. We shall also assume that respondent had taken possession of the land in controversy prior to the resurvey. It is not claimed, and cannot successfully be claimed, that respondent has ever reclaimed the land. With these premises conceded, the sole remaining question is: Did respondent, in good faith, "commence the work of reclaiming" the land in controversy prior to the resurvey? If he did not, then he never acquired the preference right accorded by the act of March 28, 1908.

[13] To entitle plaintiff to such preference right as he claims, it is not sufficient to show that he took possession and subjected the land to his dominion. He must go further and show that he at least "commenced" the work of "reclaiming" the land. If we turn to the original Desert Land Act of 1877, as amended by the act of March 3, 1891, we shall there find the statutory definition of the word "reclaim." Section 1 of the act (section 4674) provides that a qualified person, upon paying twenty-five cents per acre, may file a declaration that "he intends to reclaim a tract of desert land . . . *by conducting water upon the same.*" By section 5 (section 4678) it is provided that "no land shall be patented to any person under this act unless he or his assignors shall have expended in the necessary irrigation, reclamation and cultivation thereof, *by means of main canals and branch ditches,* and in permanent improvements upon the land, and in the purchase of water rights for the irrigation of the same, at least three dollars per acre of whole tract reclaimed and patented." To commence the work of reclaiming the land means, therefore, to commence the work of "conducting water upon the same." In construing this act, the circuit court of appeals, in *United States* v. *Mackintosh,* 85 Fed. 337 [29 C. C. A. 176, 179], says: "In the

search after fraud, the inquiry must be limited to such mat-
ters as the statute requires to be established in making the
final proof. This proof is 'satisfactory proof to the register
and receiver of the reclamation of said tract of land in the
manner aforesaid.' 'The manner aforesaid' evidently refers
back to the first clause, and to the words 'by conducting
water upon the same.' This statute, of course, in all its
provisions, should receive such construction as will reason-
ably carry out and effectuate the legislative intent. It was
the manifest purpose of Congress to hold out to the citizens
of the United States an inducement to reclaim the waste
and desert lands of the public domain, and thus render them
subservient to the uses of husbandry by process of irriga-
tion. This was to be accomplished by such a system of
ditches as would carry to the subdivisions of the land, ca-
pable of being reached by the surface flow, a supply of
water such as, when let out of the ditches by draw gates or
small ditches, might spread over the accessible parts, and
stimulate vegetable life." There is nothing in the amenda-
tory act of March 3, 1891, that changes the character of
the reclamation work required by the act of 1877, except
that under the amendment an expenditure of three dollars
per acre must be shown, and one-eighth of the land em-
braced in the entry must be cultivated. (*Connor* v. *United
States,* 214 Fed. 522, 536 [131 C. C. A. 68], citing the case
of *Cole,* 38 Land Dec. 420.)

With the foregoing definition of reclamation in mind, the
question is: Do the acts relied upon by respondent show
that he had "commenced the work of reclaiming" the land
in controversy during any part of the period when its
status was that of unsurveyed land? That is, did he, prior
to the resurvey of the land, commence the work of "con-
ducting water upon the same"?

Turning now to the acts relied upon by respondent to
support his claim that there had been commenced on the land
such reclamation work as was sufficient to create the prefer-
ence right accorded by the act of March 28, 1908: The
first of the acts so relied upon by him are: (1) His pur-
chase of Hammond's relinquishment on March 3, 1908, and
(2) the setting of redwood posts by him on March 4, 1908.

Hammond, it will be recalled, had "plowed around the
claim and cleared a small quantity of brush from the north-

west corner thereof.'' **[14]** Assuming, for the purposes of this decision only, that such work did constitute the commencement of the work of reclaiming the land, i. e., the commencement of the work of conducting water upon the land, and further assuming that any preference right to enter the land that may have accrued to Hammond by reason of his work was not personal to him but could be transferred to another (as to which, however, see *Dameron* v. *Dingee,* 1 Colo. App. 436 [29 Pac. 305]; *Welch* v. *Duncan,* 7 Land Dec. 186, and *Mayers* v. *Dyer,* 21 Land Dec. 187), the fact remains that all that plaintiff received from Hammond was a ''relinquishment,'' which, he testified, was on the regular form of relinquishment furnished by the land office. Such a document did not transfer to plaintiff any right whatever in or to the land. Hammond was not an entryman. His application had been rejected. But even had he been an entryman, his relinquishment would not have vested plaintiff with any of his rights. A relinquishment is not a contract of the entryman with the purchaser. It is only, when filed, a release to the United States of the claim of the entryman, and turns back to the United States, as the owner of the land, every right and claim that the author of the relinquishment had formerly enjoyed. (*Fain* v. *United States,* 209 Fed. 525 [126 C. C. A. 347].) In *Robertson* v. *Messent's Heirs,* 18 Land Dec. 301, the Secretary of the Interior held that if a relinquishment be given to the purchaser to file, there is created only a special agency, which expires with the death of the entryman who gave the relinquishment; and if it be not presented to the land office until after the death of the entryman, it is ineffective and should be rejected. In *Hemphill* v. *Moy,* 31 Idaho, 66 [169 Pac. 288], the court said: ''The contention of appellant that he could tack Wallace's possession on to his own for the purpose of making up the period of the statute is based upon a misconception of the legal effect of a relinquishment. . . . A relinquishment turns the land back to the United States, and with it every right, possessory or otherwise, that the entryman enjoyed. (*Moss* v. *Dowman,* 176 U. S. 413 [44 L. Ed. 526, 20 Sup. Ct. Rep. 429, see, also, Rose's U. S. Notes].) It therefore follows that whatever rights Moy obtained in or to the land were initiated when he filed his homestead entry and went

into possession. Without the aid of the alleged adverse possession of Wallace, Moy has concededly fallen far short of the statutory time.'' Obviously, Hammond's relinquishment did not clothe respondent with any preference right which the former may have possessed.

[15] Placing the redwood posts at the corners of the land in controversy, with notices thereon that plaintiff intended to reclaim the land from its desert state, may have constituted an act of possession, but by no stretch of imagination can such conduct be deemed the commencement of the work of reclaiming the land by conducting water thereon. The act of March 28, 1908, does not give a preference right to one who takes possession and merely *intends* to reclaim the land, however much he may advertise that intention. His intention, however deep-seated, must be translated into deeds—deeds which constitute the actual *bona fide* commencement of the work of reclaiming the land, i. e., the commencement of the work of ''conducting water upon the same.''

The conduct next relied upon by respondent to sustain his contention that he actually had commenced reclamation work is this: In April or May, 1908, he caused work to be done on the tract of 160 acres lying east of the lands in controversy and which now is known as Tract 87. This work was of the value of $85, and consisted of clearing and rough-leveling and the construction of borders covering about thirty acres along the east side of the tract. At that time the tract of 160 acres upon which this work was done was known as, or was supposed to be, the northwest quarter of section 12, according to the 1856 survey. It is the 160 acres upon which Mrs. Gray had previously made her desert land entry. It was not until April 30, 1909, or about a year after this work was done, that plaintiff's contest of the Gray entry was decided in his favor. Meanwhile, this tract of 160 acres adjoining the land in controversy on the easterly side thereof—designated in the Gray entry as the northwest quarter of section 12, and on the plat of the resurvey as Tract 87—was segregated from the public domain. [16] Lands originally public cease to be public when they have been entered at the land office. While the entry subsists of record, ''the land entered,'' says the court in *Hastings & D. R. Co.* v. *Whitney, supra,* 132 U. S. 361

[33 L. Ed. 363, 10 Sup. Ct. Rep. 114, see, also, Rose's U. S. Notes], "thereby becomes segregated from the mass of public lands, *and takes the character of private property.*" (Italics ours.) We think it clear that work done on an adjoining tract of land that had the character of private property cannot be treated as reclamation work done upon the land in controversy. We quite agree with what is said in the opinion handed down by the First Assistant Secretary of the Interior when passing upon the respective claims of these parties: "Obviously, a preference right of entry to public lands cannot be acquired by work performed on a tract segregated from the public domain."

[17] Between the 1st and the 21st of March, 1909, plaintiff caused an employee to do work on the land in controversy with a two-horse team and a Fresno scraper. Precisely what this work was is not made clear by the record. But, assuming that it was work done in preparing the land for irrigation by conducting water thereon, still, since the work was done *after* the approval of the plat of the resurvey, it gave to plaintiff no preference right under the act of March 28, 1908. That act gives the preference right to a qualified individual "who has, *prior to the survey,* taken possession of a tract of unsurveyed land . . . and . . . has in good faith commenced the work of reclaiming it." What is said by the First Assistant Secretary of the Interior in his opinion is apposite here: "Congress has seen fit to limit the acquisition of a preference right by virtue of improvement under the desert land law to unsurveyed land, and for the department to hold that the placing of improvements upon surveyed land operated to segregate the same from the public domain would be an unwarranted extension to surveyed lands of a law that had been limited in its terms to unsurveyed lands."

All the other work relied upon by respondent to establish his claim to a preference right is work that was performed not only after the approval of the plat of the resurvey but subsequently to the allowance of defendant's application to make entry of the land. Obviously, such work cannot possibly give any color to respondent's claim to a preference right.

For the foregoing reasons we conclude that plaintiff never, "prior to survey, . . . in good faith commenced the

work of reclaiming'' the land in controversy, and, there-
fore, never acquired a preference right under the act of
March 28, 1908.

[18] Finally, respondent claims that the Secretary of
the Interior erred in holding that appellant's knowledge
that the former was in possession of the land and had done
work thereon did not estop appellant from making appli-
cation to enter the land. For reasons already stated, it
must be held that respondent's appeal to the commissioner
of the general land office from the decision of the local
land officers rejecting his first application afforded no
reason why appellant's application should not be received
pending such appeal and be allowed just as soon as the
appeal was terminated by respondent's voluntary with-
drawal of his original application and his request for the
dismissal of his appeal to the commissioner. Also, for
reasons already stated, it must be held that respondent did
not acquire any preference right under the act of March
28, 1908, he never having commenced such reclamation as is
contemplated by that act during the time that the lands
were unsurveyed, and his purchase of Hammond's so-called
relinquishment not transferring to him any right or in-
terest in the land whatever. We have, therefore, as a
ground for respondent's claim that appellant is estopped,
only these bare facts: At the time when appellant made
his application to enter, respondent was in possession of the
land in controversy, claiming a right thereto, he had placed
redwood posts at the corners thereof, and, after the re-
survey, had caused some leveling and clearing to be done.
These facts present no element of estoppel against appel-
lant. The title was in the United States. Occupation of
the land did not and could not initiate any right thereto.
A rightful claim under the Desert Land Act could be in-
itiated only by filing a sufficient application to make entry.
(*Wilson* v. *Carson,* 43 Land Dec. 346). This the plaintiff
did not do. He did not, prior to defendant's application,
file such an application as would give him any right to enter
the land under the Desert Land Act. His first application,
filed shortly prior to the passage of the act of March 28,
1908, whereby the right to make a desert land entry was
restricted to surveyed lands, conflicted with prior, un-
canceled entries. This alone was sufficient to deprive the

application of any efficacy as the foundation of an inchoate right. Plaintiff was charged with knowledge of the law. He was bound to know that the title, which was in the United States, could be acquired by him only by initiating a right thereto by making a proper and legal application to make entry in accordance with the acts of Congress and the lawful regulations of the land department. Neither the defendant nor any officer of the land department has ever done anything to justify a claim on plaintiff's part that he has been deceived or misled. Whatever plaintiff did upon the land or expended for improvements must be held to have been done and expended with knowledge that the title was in the United States and that he could acquire it only in the manner that we have stated. With this imputed knowledge, plaintiff is not in a position to urge an estoppel against the defendant. Every element of estoppel is lacking. He could not, by simply taking possession, claiming the land as his own and doing things that gave him no preference right, estop the defendant from acquiring title in the manner provided by the acts of Congress and the regulations of the land department.

Our conclusion is that the Secretary of the Interior did not err in any of his legal conclusions, and that, therefore, the judgment should be reversed. It is so ordered.

Works, J., and Craig, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 13, 1922.

All the Justices concurred, except Sloane, J., who was absent.

Lennon, J., was absent and Richards, J., *pro tem.,* was acting.